580 F.2d 573
 188 U.S.App.D.C. 310, 26 P.U.R.4th 372
 BOROUGHS OF CHAMBERSBURG AND MONT ALTO, PENNSYLVANIA and the
Cities of Hagerstown and Thurmont, Maryland, Petitioners,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent,
Potomac Edison Company, Intervenor.
The POTOMAC EDISON COMPANY, Petitioner,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent,
Boroughs of Chambersburg and Mont Alto, Pennsylvania, et
al., Intervenors.
BOROUGH OF CHAMBERSBURG, PENNSYLVANIA, Petitioner,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent,
Potomac Edison Company, Intervenor.
BOROUGH OF CHAMBERSBURG AND MONT ALTO, PENNSYLVANIA, and
Cities of Hagerstown, Thurmont, and Williamsport,
Maryland, Petitioners,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent,
Potomac Edison Company, Intervenor.
 Nos. 76-1506, 76-1699, 77-1081 and 77-1481.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Feb. 21, 1978.
Decided April 3, 1978.
Rehearing Denied April 24, 1978.
 
 Robert A. O'Neil a member of the bar of the Supreme Court of Massachusetts, by special leave of Court, pro hac vice with whom Charles F. Wheatley, Jr., and Grace Powers Monaco, Washington, D. C., were on brief, for petitioners in Nos. 76-1506, 77-1081, and 77-1481.
 Arnold H. Quint, Washington, D. C., for petitioner in No. 76-1699 also argued for intervenor Potomac Edison Co. in Nos. 76-1506, 77-1081 and 77-1481.
 J. Paul Douglas, Atty., Drexel D. Journey, Gen. Counsel, Federal Energy Regulatory Commission, Robert W. Perdue, Deputy Gen. Counsel, Allan Abbot Tuttle, Sol., Thomas M. Walsh, Atty., on brief, and Philip R. Telleen, Atty., Federal Energy Regulatory Commission, Washington, D. C., for respondent.
 Charles F. Wheatley, Jr., and Grace Powers Monaco, Washington, D. C., were on brief, for intervenor in No. 76-1699.
 Before WRIGHT, Chief Judge, and BAZELON and WILKEY, Circuit Judges.
 Opinion PER CURIAM.
 
 PER CURIAM:
 
 1
 On November 5, 1975, and on February 12, 1976, the Potomac Edison Co. filed proposed rate increases for the 1976 calendar year with the Federal Power Commission (the Commission).[1] Joint Appendix (J.A.) at 81-93. On March 12, 1976, the Commission suspended these rates and set the matter for a hearing. Id. Potomac Edison, the Town of Front Royal, Virginia, and the Old Dominion Electric Cooperative reached a settlement on September 3, 1976, according to which Potomac Edison's rates would rise only to approximately 70% Of its proposed rate increases. Id. at 296. Since Front Royal had a fixed rate contract[2] that was not due to expire until 1980, its rate increase would occur in two steps, 50% On June 1, 1977, and 50% On May 31, 1978. Id. The Old Dominion Electric Cooperative, on the other hand, had a going rate contract[3] with Potomac Edison, and consequently it would be charged the full negotiated rate increase as of April 14, 1976. Id.
 
 
 2
 On September 21, 1976, petitioners in Nos. 76-1506, 77-1081 and 77-1481, the Boroughs of Chambersburg and Mont Alto, Pennsylvania, and the cities of Hagerstown, Thurmont and Williamsport, Maryland, (hereinafter termed petitioners), filed a motion requesting to be included "on an equal basis" in this settlement. J.A. at 285. The Commission, having determined that none of the petitioners except Chambersburg had fixed rate contracts, Id. at 186-92, concluded that the negotiated rate increase for all the petitioners other than Chambersburg would become effective April 14, 1976, and that the rate increases for Chambersburg would go into effect in stages, 50% On June 1, 1977, and 50% On March 16, 1978, when Chambersburg's fixed rate contract was due to expire. Since the Commission also determined that Chambersburg's fixed rate contract was effective only for service up to 25,000 Kw, all of the negotiated price increases for service above that level would go into effect on April 14, 1976.[4] J.A. at 297; supplemental initial brief for petitioners at 3.
 
 
 3
 Petitioners objected to the timing of the rate increases, arguing that there net effect would constitute an "unreasonable difference in rates, . . . either as between localities or as between classes of service" in violation of § 205(b) of the Federal Power Act.[5] They relied on two early Commission cases construing § 205(b). In Gulf States Utilities Co., 1 FPC 522 (1938), a power company had informed the Commission of its intent to offer a lower rate to its customers as their respective contracts expired over an approximately three year interval. The Commission had found that this procedure violated § 205(b), and it stated that
 
 
 4
 It is obvious that to deny . . . customers the benefit of the lower rate until their respective rate contracts expire will unduly prolong the present discriminations. Proper practice and the avoidance of undue discrimination requires, except in unusual cases, that once a new rate is adopted by a company it be made available and applied uniformly to all customers of the same class at the same time.
 
 
 5
 Id. at 524. In Otter Tail Power Co., 2 FPC 134 (1940), a power company had sought to justify the different rates charged its municipal customers on the basis of their population sizes and the results of "individual negotiation and bargaining between the (company) and the municipality . . . involved." Id. at 142. The Commission had found that since there was "no substantial variation in the service conditions or in the characteristics of the delivery and sale of energy to these customers," Id. at 141, and since there was "no evidence in the record whatever indicating that the cost per kilowatt-hour to respondent of producing and delivering energy to any one of these customers differs from the cost per kilowatt-hour of producing and delivering energy to any other one of these customers," Id., the company had been in violation of § 205(b).
 
 
 6
 Distinguishing these early decisions the Commission rejected petitioners' argument, stating that Gulf States Utility Co. and Otter Tail Power Co. had been qualified by subsequent decisions of the Supreme Court. In FPC v. Sierra Pacific Power Co., 350 U.S. 348, 76 S.Ct. 368, 100 L.Ed. 388 (1956), the Court had determined that a supplier of power subject to regulation under the Federal Power Act could not depart from a contract obligation to deliver power at a firm price by unilaterally filing proposed rate increases with the Commission under § 205(d) of the Act. Absent an exercise of the Commission's power under § 206(a) "to prescribe a change in contract rates whenever it determines such rates to be unlawful." Id. at 353, 76 S.Ct. at 371, the contract rates would remain binding. In its construction of the Act, the Court relied upon its interpretation of the Natural Gas Act in the companion case of United Gas Pipe Line Co. v. Mobile Gas Service Corp., 350 U.S. 332, 76 S.Ct. 373, 100 L.Ed. 373 (1956). In that case the Court had analyzed the policies underlying parallel provisions of the Natural Gas Act:
 
 
 7
 Our conclusion that the Natural Gas Act does not empower natural gas companies unilaterally to change their contracts fully promotes the purposes of the Act. By preserving the integrity of contracts, it permits the stability of supply arrangements which all agree is essential to the health of the natural gas industry. Conversion by consumers, particularly industrial users to the use of natural gas may frequently require substantial investments which the consumer would be unwilling to make without long-term commitments from the distributor, and the distributor can hardly make such commitments if its supply contracts are subject to unilateral change by the natural gas company whenever its interests so dictate. . . . On the other hand, denying to natural gas companies the power unilaterally to change their contracts in no way impairs the regulatory powers of the Commission, for the contracts remain fully subject to the paramount power of the Commission to modify them when necessary in the public interest. The Act thus affords a reasonable accommodation between the conflicting interests of contract stability on the one hand and public regulation on the other.
 
 
 8
 350 U.S. at 344, 76 S.Ct. at 380. Two years later, in United Gas Pipe Line Co. v. Memphis Light, Gas and Water Div., 358 U.S. 103, 79 S.Ct. 194, 3 L.Ed.2d 153 (1958), the Court held that where a public utility's going rate contract with a customer permitted the utility "to change its rates from time to time," Id. at 110, 79 S.Ct. at 198, such changes could become effective upon unilateral filing with the Commission. The Court emphasized
 
 
 9
 the legitimate interests of natural gas companies in whose financial stability the gas-consuming public has a vital stake. Business reality demands that natural gas companies should not be precluded by law from increasing the prices of their product whenever that is the economically necessary means of keeping the intake and outgo of their revenues in proper balance; otherwise procurement of the vast sums necessary for the maintenance and expansion of their systems through equity and debt financing would become most difficult, if not impossible.
 
 
 10
 Id. at 113,[6] 79 S.Ct. at 200.
 
 
 11
 The Commission reasoned that Sierra and Memphis, taken together, would inevitably create a situation where various customers would be charged different rates, depending upon whether their contracts were of the Mobile-Sierra or Memphis variety. See Municipal Electric Utility Ass'n v. FPC, 158 U.S.App.D.C. 188, 485 F.2d 967 (1973). It concluded, therefore, that these decisions would require modification of its earlier holdings in Gulf States Utilities Co. and Otter Tail Power Co.[7] The Commission ruled that a difference in rates due solely to the operation of the Mobile-Sierra doctrine would not constitute "undue preference" under the Act:
 
 
 12
 It has never been held by this Commission nor the courts that customers who do not have fixed rate contracts are still entitled to the benefits of the Mobile-Sierra rule because a similar customer does have a fixed rate contract. This is consistent with the result reached by the Supreme Court in United Gas Pipe Line Company v. Memphis Light Gas and Water Division, 358 U.S. 103 (, 79 S.Ct. 194, 3 L.Ed.2d 153) (1958) wherein the court allowed unilateral filings for the customers who did not have fixed rate. The fact that one customer, Front Royal, has a fixed rate contract and the other customers do not is not an adequate basis for giving all of the other customers the benefits of Front Royal's contract.
 
 
 13
 J.A. at 298. In denying petitioners' motion for a rehearing, the Commission reiterated this holding:
 
 
 14
 On March 21, 1977, in this proceeding this Commission issued an order accepting a proposed settlement with a rate increase filing by Potomac Edison Company for service to various wholesale customers. We also found that where one of the customers had a fixed rate contract and therefore the increase should be deferred to that customer, the other customers who did not have fixed rate contracts where not entitled to the benefits of a deferred rate increase simply because the one customer did have a contract preventing an increase under the Sierra-Mobile doctrine.
 
 
 15
 J.A. at 310. The municipalities petition for review pursuant to 16 U.S.C. § 825L (1970). See 42 U.S.C.A. § 7192(a) (West Supp. Nov. 1977).
 
 
 16
 We recognize the tension that exists between the Supreme Court's decision in Mobile, Sierra and Memphis, and the Commission's early interpretations of § 205(b). The Court's decisions rest on "the need . . . for individualized arrangements between natural gas companies and distributors," 350 U.S. at 339, 76 S.Ct. at 378, while the Commission's decisions were based on the ever-present possibility of discrimination "when the sole power to determine rates is left within the hands of the utility which has a monopoly of the service and when, in addition, the utility has the power to discriminate against customers in a weak bargaining position." 2 FPC at 145. We note, however, that the Commission's ruling in this case is not logically required by Mobile, Sierra, or Memphis, since the Court did not consider any claims of "undue preference" in those decisions,[8] and since unilateral rate increases, even if permitted by contract, might be limited by the factors set out in Gulf States Utilities Co. and Otter Tail Power Co.
 
 
 17
 Nevertheless, the Commission was correct in applying the underlying reasoning of the Supreme Court. In Memphis the Court emphasized the requirement "that natural gas companies should not be precluded by law from increasing the prices of their product whenever that is the economically necessary means of keeping the intake and outgo of their revenues in proper balance." 358 U.S. at 113, 79 S.Ct. at 200. If a fixed rate contract with one of its customers were to prevent a public utility from changing the rates of its other customers, even though it had bargained in arm's length negotiations for the right to do so, this necessary flexibility would disappear. Section 205(b) does not require absolute uniformity, but proscribes only "any Unreasonable difference in rates" and "any Undue preference or advantage." We therefore affirm the order of the Commission.
 
 
 18
 We emphasize, however, the narrowness of our holding. Throughout these proceedings, the Commission has found that the temporary difference in rates caused by the settlement was due Solely to the fact that Front Royal and Chambersburg were protected by the Mobile-Sierra doctrine, whereas, Thurmont, Hagerstown, Williamsport and Mont Alto were not.[9] See J.A. at 191, 297-98, 310. When counsel for petitioners was asked at oral argument whether he was seeking a remand to develop further facts upon which to base a claim of undue preference, he responded in the negative.[10] We therefore intimate no view whatever concerning the additional factors necessary to constitute a violation of § 205(b). We decide only that if it is shown that a rate differential exists which stems from the fact that a public utility is free to file for unilateral rate increases with respect to some of its customers while the rates it charges to the remainder are frozen under the Mobile-Sierra doctrine, and if Nothing else is demonstrated, then that rate differential does not violate § 205(b) of the Federal Power Act.
 
 
 19
 The decision of the Commission is affirmed.
 
 
 
 [1]
 The powers and duties of the Federal Power Commission (FPC) were transferred to the Federal Energy Regulatory Commission as of October 1, 1977. Department of Energy Organization Act, 42 U.S.C.A. §§ 7171-7177, 7295(c), 7341 (West Supp. Nov. 1977). Although the events relevant to this case occurred before that time, we will refer to the FPC throughout as "the Commission" in order to avoid confusion
 
 
 [2]
 A fixed rate contract is one that does not permit a public utility to effect unilateral rate increases merely by filing them with the Commission
 
 
 [3]
 A going rate contract is one in which the public utility binds itself to furnish power to its customers during the life of the contract "Not at a single fixed rate, . . . but at what in effect amounts to its current 'going rate.' " United Gas Pipe Line Co. v. Memphis Light, Gas and Water Div., 358 U.S. 103, 110, 79 S.Ct. 194, 198, 3 L.Ed.2d 153 (1958)
 
 
 [4]
 After a careful study of the record in these cases as reflected in the Joint Appendix and referred to in the briefs of the parties, we affirm the determination of the Commission that the contracts of Hagerstown, Mont Alto, Williamsport, and Thurmont with Potomac Edison did not bar Potomac Edison from filing with the Commission unilateral rate increases, and that Chambersburg possessed a fixed rate contract with Potomac Edison for service up to 25,000 Kw that did not entitle Chambersburg to full requirements service
 
 
 [5]
 Section 205(b), 16 U.S.C. § 824d(b), states:
 No public utility shall, with respect to any transmission or sale subject to the jurisdiction of the Commission, (1) make or grant any undue preference or advantage to any person or subject any person to any undue prejudice or disadvantage, or (2) maintain any unreasonable difference in rates, charges, service, facilities, or in any other respect either as between localities or as between classes of service.
 Chambersburg also argued that § 205(b) required Potomac Edison to supply Chambersburg with full requirements service, since Potomac Edison's contract with Front Royal provided for such service. J.A. at 269-73.
 
 
 [6]
 Although Memphis and Mobile dealt with the Natural Gas Act, we have elsewhere acknowledged the applicability of their holdings and reasoning to the Federal Power Act. See Richmond Power and Light v. FPC, 156 U.S.App.D.C. 315, 317-323, 481 F.2d 490, 492-98, Cert. denied sub nom. Indiana & Michigan Electric Co. v. Anderson Power & Light, 414 U.S. 1068, 94 S.Ct. 578, 38 L.Ed.2d 472 (1973)
 
 
 [7]
 The Commission had earlier recognized this tension. See Indiana & Michigan Electric Co., 50 FPC 16, 17 (1973): "In short, Mobile-Sierra might have the effect of dictating different rates to customers otherwise similarly situated, and that is one reason why we have expressed misgivings about it. . . . Otter Tail Power Company, 2 FPC 134 (1940), and The Gulf States Utilities Company, 1 FPC 522 (1938), preceded the development of the Mobile-Sierra rule in 1956."
 
 
 [8]
 Mobile and Memphis involved construction of the Natural Gas Act, which, in § 4(b), contains a provision exactly analogous to § 205(b) of the Federal Power Act. Section 4(b) states:
 No natural-gas company shall, with respect to any transportation or sale of natural gas subject to the jurisdiction of the Commission, (1) make or grant any undue preference or advantage to any person or subject any person to any undue prejudice or disadvantage, or (2) maintain any unreasonable difference in rates, charges, service, facilities, or in any other respect, either as between localities or as between classes of service.
 15 U.S.C. § 717c(b) (1970).
 
 
 [9]
 With respect to Chambersburg's claim that Potomac Edison's full requirements contract with Front Royal was unduly discriminatory unless Chambersburg was also granted similar service, Supra note 5, the Commission stated:
 The other issue raised by the Cities is in regard to whether Chambersburg should be entitled to full service under a fixed rate contract which provides currently for up to 25,000 Kw service. Chambersburg argues that since all the other customers get full service it is discriminatory against Chambersburg to limit it to 25,000 Kw until its contract expires on March 16, 1978. By order issued September 17, 1976, in Docket No. ER76-788 we approved service in excess of 25,000 Kw for Chambersburg at rates subject to refund pending the outcome of this proceeding. Here again, we find that Chambersburg is only entitled to the benefits of its fixed rate as provided in the contract which limits service to 25,000 Kw. For anything above that Chambersburg is in the same position as the other parties with the exception of Front Royal and the settlement rates should apply to Chambersburg as of April 14, 1976, for service above its contract limitation.
 J.A. at 298. The Commission thus having "approved service in excess of 25,000 Kw for Chambersburg," the issue resolves into one of rate discrimination. We consider moot the question of whether § 205(b) requires Chambersburg to receive a full requirements contract.
 
 
 [10]
 Counsel stated that "our position is that to the extent that the company is going to maintain a difference in rates, the burden is on the company to establish that the difference is justified. . . . We did not believe that it was our duty to go out and look under stones and try to find some reason why we were not entitled to equal treatment."
 Counsel was of course correct that under § 205(e) of the Act, 16 U.S.C. § 824d(e), the burden of proof at any hearing involving a rate or charge sought to be increased is on the public utility "to show that the increased rate or charge is just and reasonable." In this case, however, the Commission found that the difference in rates "is simply a rate difference which arises from the fact that certain municipalities . . . executed amendments to their contracts to permit unilateral filings by Edison, thereby relinquishing their former status under the Mobile-Sierra doctrine." J.A. at 191.