**TOWN OF NORWOOD, MASSACHU-SETTS, Petitioner,**

v.

**FEDERAL ENERGY REGULATORY COMMISSION, Respondent,**

**Boston Edison Company, Intervenor.**

**No. 77–1326.**

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 19, 1978.

Decided Oct. 23, 1978.

As Amended Nov. 6, 1978.

Charles F. Wheatley, Jr., Washington, D. C., with whom Grace Powers Monaco and Robert A. O'Neil, Washington, D. C., were on the brief, for petitioner.

Joseph G. Stiles, Atty., Federal Energy Regulatory Commission, Washington, D. C., with whom Robert W. Perdue, Acting Gen. Counsel, and Philip R. Telleen, Atty., Federal Energy Regulatory Commission, Washington, D. C., were on the brief, for respondent.

George F. Bruder, Washington, D. C., with whom Carmen L. Gentile, Washington, D. C., was on the brief, for intervenor.

Before WRIGHT, Chief Judge, MacKIN-NON, Circuit Judge, and AUBREY E. ROBINSON, Jr.,* District Judge.

Opinion for the court filed by Chief Judge J. SKELLY WRIGHT.

J. SKELLY WRIGHT, Chief Judge.

This is a petition for review of the Federal Power Commission's [1] resolution of a variety of disputes stemming from efforts by the Town of Norwood, Massachusetts, to discontinue purchasing wholesale power from the Boston Edison Company and commence purchasing it at a lower rate from the New England Power Company (NEPCO), while using Edison's transmission facilities to "wheel"[2] the power thus purchased. The most important issue raised concerns the intersection of the Supreme Court's *Mobile-Sierra* doctrine[3] and the

---

* Of the United States District Court for the District of Columbia, sitting by designation pursuant to 28 U.S.C. § 292(a) (1976).

1. The Federal Power Commission went out of existence in the fall of 1977 and most of its functions were transferred to the Federal Energy Regulatory Commission (FERC), which was created by the Department of Energy Organization Act of 1977, 42 U.S.C. § 7101 *et seq.* (Aug. 4, 1977). Under §§ 705(c) and 705(e) of that Act, 42 U.S.C. §§ 7295(c) and 7295(e), appeals taken prior to the statute are not affected by it

except that substitution of appropriate parties is provided for.

2. The only transmission lines connecting to the Town's distribution system are owned by Edison. "Wheeling" is an industry term which denotes the use of one utility's transmission facilities to transmit power from another utility.

3. *See United Gas Pipe Line Co. v. Mobile Gas Service Corp.,* 350 U.S. 332, 76 S.Ct. 373, 100 L.Ed. 373 (1956); *FPC v. Sierra Pacific Power*

nondiscrimination requirement of Section 205(b) of the Federal Power Act, 16 U.S.C. § 824d(b) (1976). For the reasons discussed below, we conclude that the case must be remanded to the FERC so that the record may be reopened and the issues reconsidered in light of this court's recent decision in *Boroughs of Chambersburg et al. v. FERC*, 188 U.S.App.D.C. 310, 580 F.2d 573 (1978) (*per curiam*), as well as the instant opinion. Because the result on remand may alter or moot some of the other issues raised before this court, we express no opinion as to those other issues.[4]

I

In October 1972 the Town of Norwood informed Edison of its intention to cease purchasing its wholesale electricity requirements from the company "as soon as possible after January 1, 1973" and become an all-requirements customer of NEPCO, utilizing Edison transmission lines to wheel the NEPCO power. Joint Appendix (JA) 260. On December 8, 1972 Edison wrote back stating that it did not have on file a transmission rate appropriate for such wheeling, that it was studying the Town's plan but was as of then "unable to commit to any particular course of action," that were the Town to terminate its all-requirements contract with Edison as proposed the company would suffer revenue losses of about $4.75 million, and that it would expect to be compensated for those losses in view of the Town's failure to comply with advance notice requirements set forth in a tariff settlement to which the Town had been a party. JA 263–270.

Co., 350 U.S. 348, 76 S.Ct. 368, 100 L.Ed. 388 (1956). These cases are discussed at 190 U.S. App.D.C. ———, 587 F.2d 1310–1311 *infra*.

4. More specifically, we decline at this time to consider Norwood's challenges to (1) Edison's computation of the adverse impacts that would flow from termination of its contract to supply the Town; (2) the Commission's finding that the Town would be accountable to Edison for those adverse impacts; and (3) Edison's method of calculating wheeling rates. Nor do we consider the Commission's finding that Edison was willing to wheel power for Norwood, although the discrimination issue dealt with in the body of this opinion may have some bearing on this general point.

In a March 8, 1973 letter to Edison the Town stated that NEPCO was willing to supply its needs commencing in November 1974, challenged the Edison figure for termination losses, sought ways of avoiding liability for those losses, and requested terms for the wheeling services it needed. JA 271–272. Edison responded briefly on April 10, JA 273, and more fully on June 26, JA 274–276. In the latter communication the company stated that it would be willing to file a wheeling rate with the Federal Power Commission "if we are definitely advised by Norwood * * * of the Town's committed plans for changes in the service it desires * * * ." JA 274. The letter went on to state that Edison intended to seek from the Commission an order defining any Edison obligation to provide wheeling services and to urge the Commission to determine that it would not be in the public interest for Edison to wheel power for the Town.[5] The company did pledge to provide interim wheeling services if the Commission had not resolved the matter by the time the Town was committed to begin taking power from NEPCO. JA 275. Several months later the company offered to ensure that the Town would not suffer any loss as a result of Edison's efforts to secure a Commission determination that it was not obligated to furnish wheeling services. In particular, the company indicated that were it successful before the Commission it would either wheel power voluntarily for Norwood until such time as the Town was able to terminate any contract with NEP-

5. That letter states in part:

> We seriously question whether it is in the public interest or in keeping with good utility practice to furnish such transmission services in the circumstances here presented. Therefore, if we are advised of Norwood's committed plans to take firm requirements service from NEPCO, we intend to seek from the Federal Power Commission an order defining any Boston Edison Company obligation in the public interest to furnish transmission of firm power from NEPCO to Norwood
> * * *. * * *

JA 275.

CO without penalty or hold Norwood harmless against any such penalty.[6] Norwood did not follow up on this offer. Indeed, the parties never got much closer to the bargaining table—perhaps because of the events detailed in the next paragraph.

Just after the Town of Norwood's first letter, Edison entered into an entirely unrelated agreement to wheel power for NEPCO, which had become the wholesale supplier for what is termed Quincy-Weymouth area.[7] The Edison-NEPCO agreement called for wheeling services substantially similar to those sought by the Town of Norwood at a price amounting to $6.36 per kw per year, JA 648, or about 30 percent less than the amount which Edison's correspondence suggested that Norwood would have to pay.[8] Although the Edison-NEPCO contract was executed on November 1, 1972, it was not placed on file with the Commission until May 7, 1973. Accordingly, it remained unknown to Norwood (and to the general public) until six months after its effective date.[9] In June 1973 Norwood sought to intervene in the Edison-NEPCO rate filing, arguing that to prevent undue discrimination it should be given the right to purchase wheeling services at the same rate. The Commission accepted the filing on August 24, 1973, and instituted an investigation of the rate under Section 206(a) of the Federal Power Act, 16 U.S.C. § 824e(a) (1976). Norwood was permitted to intervene, JA 457–461. Subsequently, NEPCO was permitted to intervene as well.

On March 5, 1974 Edison commenced a separate proceeding before the Commission—this one relating directly to the Town of Norwood. JA 471–520. Edison sought a declaratory order that (1) it was not legally obligated to furnish wheeling services to the Town, (2) the Town had failed to give the required notice of its proposed change of suppliers, (3) Edison had properly computed the adverse financial impact that would result if the Town terminated its all-requirements contract without giving adequate notice to the company, and (4) Edison's method of calculating the wheeling rate that would apply to the Town was appropriate. JA 471–490.

In September 1974, over the objection of Norwood, the two Commission proceedings were consolidated. Joint hearings began shortly thereafter. An initial decision was issued on May 21, 1976 by an Administrative Law Judge. JA 575–588. The parties excepted to various portions of that decision, and on December 7, 1976 the Commission reversed in part and affirmed in part. JA 646–666. Specifically, it concluded (1) that the low wheeling rate in the Edison-NEPCO contract could not be increased without NEPCO's consent notwithstanding Edison's assertion that the rate was non-compensatory and unreasonable; (2) that Norwood had no right under the Federal Power Act to demand wheeling at a similarly low rate; (3) that Edison was willing to

---

**6.** *See* letters from Boston Edison Company to Town of Norwood of November 9, 1973 and January 15, 1974, JA 513–514, 517–518.

**7.** The Edison-NEPCO agreement is set forth at JA 201–215.

**8.** These figures are set forth in the Commission's initial decision at JA 648. The rate disparity stems from the fact that the contract provides for Edison to recover costs only for its 115 kv and smaller transmission facilities. JA 205. Typical wheeling rates, in contrast, would provide for recovery of costs associated with higher voltage facilities as well. The agreement recites that the low-voltage-recovery-only feature is provided "in recognition" of the fact that NEPCO had agreed several years earlier in a totally separate contract to pay a substantial amount toward Edison's high voltage facilities. *Id.* The agreement permits Edison unilaterally

to alter the amount charged for recovery of costs associated with the low voltage equipment as those costs rise. The exclusion of high voltage costs, however, can be changed only by mutual consent or arbitration. JA 204–205.

**9.** Under § 205 of the Federal Power Act, 16 U.S.C. § 824d (1976), rate changes may not go into effect until 30 days after notice has been given to the Commission and the rates have been filed. The Commission, however, is permitted to allow changes to take effect without compliance with these requirements "for good cause shown." Section 35.11 of 18 C.F.R. similarly allows the Commission, "for good cause shown," to permit an initial rate filing to be effective prior to the date of filing. This is what was done in this case. JA 457–458.

wheel power for Norwood, and therefore that the company's request for a declaratory order that it was not compelled to do so was moot; (4) that Norwood had failed to comply with the applicable notice requirements, that that failure was not excused by the difficulty of obtaining a wheeling commitment from Edison, and that Edison had neither waived those requirements nor discriminated unlawfully against Norwood by permitting prior customers to terminate on less notice; and (5) that Edison's calculations of adverse impact and wheeling rates were, with certain modifications, proper. Various motions for rehearing were filed, initially granted, and ultimately denied. JA 667–750. Thereafter, Norwood filed this appeal seeking a determination that the Commission erred (a) in failing to find that Edison had wrongfully discriminated against the Town; (b) in finding that the Town would be answerable for any adverse impact to Edison caused by its failure to give adequate notice of committed plans to terminate; and (c) in finding that Edison's methods of computing adverse impact and wheeling rates were just and reasonable. We deal here with only the discrimination issue.[10]

## II

The framework in which Norwood's discrimination claim must be resolved is set by two Supreme Court decisions and Section 205(b) of the Federal Power Act. The two decisions—*United Gas Pipe Line Co. v. Mobile Gas Service Corp.,* 350 U.S. 332, 76 S.Ct. 373, 100 L.Ed. 373 (1956), and *FPC v. Sierra Pacific Power Co.,* 350 U.S. 348, 76 S.Ct. 368, 100 L.Ed. 388 (1956)—hold that, under parallel provisions of the Natural Gas and Federal Power Acts, regulated suppliers cannot unilaterally increase the rates charged to customers whose contracts specify fixed rates. In *Mobile* the Court emphasized the need for orderly planning and stable power supply arrangements and the role in meeting that need which can be played by fixed-price contracts. It concluded that denying to suppliers the right

through unilateral action to alter contractually set rates would preserve the integrity and reliability of contracts without impairing the power of the Commission to modify rates—whether contractually set or not—where the public interest so requires. 350 U.S. at 344, 76 S.Ct. 373. In *Sierra* the Court went on to indicate three circumstances under which the Commission might conclude that a rate set by contract may be found contrary to the public interest and therefore revised. The mere fact that the rate produces less than a fair return is insufficient, the Court said. Rather "the rate [must be] so low as to adversely affect the public interest—as where it might impair the financial ability of the public utility to continue its service, cast upon other consumers an excessive burden, or be unduly discriminatory." 350 U.S. at 355, 76 S.Ct. at 372. Together, the two cases make it crystal clear that a heavy burden must be met before a customer who has negotiated a fixed-price contract can be deprived against his will of the benefits of his bargain.

Section 205(b) intersects with this doctrine by adding an independent prohibition against discrimination. It states:

**(b) Preference or advantage unlawful**

No public utility shall, with respect to any transmission or sale subject to the jurisdiction of the Commission, (1) make or grant any undue preference or advantage to any person or subject any person to any undue prejudice or disadvantage, or (2) maintain any unreasonable difference in rates, charges, service, facilities, or in any other respect, either as between localities or as between classes of service.

16 U.S.C. § 824d(b) (1976). In addition, Section 205(a) requires that rates be "just and reasonable." 16 U.S.C. § 824d(a) (1976).

■ As this court observed in *Boroughs of Chambersburg et al. v. FERC, supra,* a tension arises between *Mobile-Sierra* and Section 205(b) whenever there exits a group of customers some of whom are guaranteed

---

**10.** *See* note 4 *supra.*

rather low rates by fixed-price contracts while others who are similarly situated save for the absence of such contracts are charged more. 188 U.S.App.D.C. at 314, 580 F.2d at 577. *See also Towns of Alexandria, Minn., et al. v. FPC,* 181 U.S.App.D.C. 83, 87–93, 555 F.2d 1020, 1024–1030 (1977). Where this occurs, there are three alternatives: (1) the lower, contractually fixed rate can be revised upward to a reasonable and compensatory level and offered to all customers; (2) the lower, contractually fixed rate can be offered to all customers; or (3) a difference in rates can be tolerated by permitting the contractual customer to receive his bargained-for rate while charging the others reasonable and compensatory rates.[11] Each alternative is not without its drawbacks. The first deprives the contracting party of a rate upon which he is likely to have relied and undermines the entire purpose of fixed-rate contracts. The second will sometimes place a severe burden on the utility—so much so that it may well decline in the future to enter into any fixed-rate contracts.[12] And the third sanctions a difference in treatment not immediately reconcilable with the Federal Power Act.

In *Chambersburg* we chose the third alternative under circumstances where the difference in rates charged to various cus-

tomers was "due *solely* to the fact that [certain low rate customers] were protected by the *Mobile-Sierra* doctrine * * *." 188 U.S.App.D.C. at 314, 580 F.2d at 577 (emphasis in original).[13] We were careful to limit that holding to situations in which *"nothing else"* had been demonstrated; and we specifically "intimate[d] no view whatever concerning the additional factors necessary to constitute a violation of § 205(b)." *Id.* at 315, 580 F.2d at 578 (emphasis in original). We thus made it quite clear that the mere presence of a *Mobile-Sierra* contract will not automatically shield any and all discriminatory treatment from attack under Section 205(b) of the Federal Power Act. Rather, that section remains an independent force which must be accommodated.

In the instant case, we conclude that the Commission—which of course acted prior to our *Chambersburg* decision—did not arrive at an adequate accommodation. It first determined that the Edison-NEPCO wheeling rate was insulated from unilateral change by Edison, and then applied the three-part *Sierra* test[14] to determine whether the public interest required that the rate be increased by the Commission acting under Section 206(a).[15] It found that

---

11. In the normal case, each alternative will have its champions. Specifically, the beneficiary of the low, fixed rate will be adamant in its efforts to avoid choice (1) and relatively indifferent between choices (2) and (3) (with perhaps a mild preference for the latter). The utility will press for alternative (1), regard number (3) as a fallback position, and resist number (2) at all costs. And the outsiders will argue strenuously that number (2) is the only proper result. This is, not surprisingly, precisely the pattern in the present case.

12. In some circumstances, this alternative may also have the effect of subtly disfavoring the once-favored customer with a fixed-rate contract. If we assume that that customer obtained the fixed-price clause via arm's-length bargaining, he presumably had to give something up for it. By generalizing his hard won fixed-price term among those who did not have to give anything up, a new species of discrimination may be created.

13. The utility in *Chambersburg* had filed proposed rate increases for a class of customers including two which had *Sierra-Mobile* con-

tracts. 188 U.S.App.D.C. at 311, 580 F.2d at 574. Subsequent negotiations resulted in agreement on somewhat smaller increases than those filed. *Id.* For the two customers with fixed-rate contracts, these increases were to be deferred until the expiration of those contracts, while the other customers would promptly be charged the new and higher rate. These other customers sought to delay their increases on grounds that any other result would lead to discrimination prohibited by § 205(b). *Id.* at 312, 580 F.2d at 575.

14. *See* 190 U.S.App.D.C. at ——, 587 F.2d at 1310, *supra.*

15. Section 206(a) of the Federal Power Act, 16 U.S.C. § 824e(a) (1976), provides:

Whenever the Commission, after a hearing had upon its own motion or upon complaint, shall find that any rate, charge, or classification, demanded, observed, charged, or collected by any public utility for any transmission or sale subject to the jurisdiction of the Commission, or that any rule, regulation,

the low NEPCO rate would not (1) affect Edison's capacity to continue in operation, (2) impose an excessive burden on other Edison customers, or (3) be unduly discriminatory for purposes of that test.[16] JA 658–659. Accordingly, it concluded that the Edison-NEPCO rate could be changed neither by Edison nor by the Commission. Having found a *Mobile-Sierra* shield, the Commission proceeded to give rather short shrift to the Town of Norwood's argument that under Section 205(b) the low NEPCO rate must be extended to other similarly situated customers. In its original opinion it stated:

> Finally, we must reject Norwood's contention that all similar rates should be lowered to the level of the fixed-rate Quincy-Weymouth Agreement. Having previously made the finding that, since Edison's other jurisdictional customers should only be paying just and reasonable rates, there is no undue discrimination from this one contract which is governed by the *Sierra-Mobile* doctrine, Norwood has not been aggrieved. Remedies which might ordinarily be available to the Commission under the Federal Power Act are limited in the *Sierra-Mobile* context.

JA 659. Subsequently, when it denied motions for rehearing, it reasoned that its obligation was to set just and reasonable rates, that the Edison-NEPCO rate was not just and reasonable, and therefore that it was not obligated to require Edison to extend that rate to Norwood. JA 748.

In our view, the Commission approach comes altogether too close to reading Section 205(b) out of the Federal Power Act in cases where there is a *Sierra-Mobile* contract. Nothing in the *Mobile* and *Sierra* cases requires such a result. Those decisions merely specify that heavy burdens must be met before contractually fixed low rates may be increased without the consent of the customer; they do not deal with the possibility that the presence of such low rates may require that other rates be lowered to prevent undue discrimination. And this possibility is, in our judgment, a genuine one. Indeed, it may in some circumstances be the only way of reconciling the policies favoring fixed-rate contracts which motivate the *Mobile-Sierra* doctrine with the concerns with fairness and avoidance of competitive advantage which underlie Section 205(b).

■ We do not, of course, assert that contractually fixed rates must generally be extended to all who later seek them. *Chambersburg* held just the opposite, and for sound reasons. The process of bargaining over contractual terms is necessarily a technique for risk allocation. Where several customers have bargained with a utility over a period of time, it is quite likely that the contracts which result will differ. Customers' needs may vary, as will their general level of risk aversion and the types of risk to which they are most averse. They may have different projections about likely cost changes, technological advances, or demand fluctuations. And their bargaining power is likely to vary as well. *Chambersburg* stands for the proposition that when there is no reason to question what occurred at the contract formation stage, the parties may be required to live with their bargains as time passes and various projections about the future are proved correct or incorrect.[17]

---

practice, or contract affected [*sic*] such rate, charge, or classification is unjust, unreasonable, unduly discriminatory or preferential, the Commission shall determine the just and reasonable rate, charge, classification, rule, regulation, practice, or contract to be thereafter observed and in force, and shall fix the same by order.

**16.** The undue discrimination prong of the *Sierra* test is discussed at 190 U.S.App.D.C. at ——–——, 587 F.2d at 1313–1315, and note 21, *infra*.

**17.** The relevant source of justifications for the treatment accorded various customers in such a case, in other words, is the situation that existed and the probability distributions that were calculated at the time of contract formation. If, based upon the projections that could be made at that time, differences in treatment are cost justified, the fact that a particular outcome within the probability distribution against which the parties bargained has come to pass is of far less import, although it is at least conceivable that there could be a case in which circumstances have so changed and the

In the present case, however, there are allegations wholly different from those in *Chambersburg*—allegations which go to the fairness and good faith of the parties at the contract formation stage. In particular, Norwood challenges the very granting of the low rate to NEPCO in the original contract. It asserts that the wheeling agreement was a "sweetheart" deal negotiated at a time when the two companies were involved in merger discussions.[18] The Commission, while apparently somewhat perplexed by the source of and rationale for the low and somewhat unusual rate, did not really explore it.[19] Yet surely neither *Mobile-Sierra* nor our *Chambersburg* decision permits a utility to use a fixed-rate contract as a device to render unassailable an otherwise prohibited undue preference. On the contrary, if such discrimination can be demonstrated, Section 205(b) requires that every effort be made to eliminate it.

The quest for an appropriate means of doing so may well be difficult. The Supreme Court's *Sierra* test [20] states that certain forms of undue discrimination can be grounds for disturbing the bargain reached

in a fixed-rate contract. Clearly this does not mean that the simple fact that parties protected by such a contract pay less than those not so protected is grounds for revision, for if it did *Sierra* would provide scant protection to the contracting process. Nor do we think it can mean that in every case where there is evidence of something beyond a mere difference of price—evidence clearly establishing undue discrimination or an undue preference—the proper remedy will necessarily be to increase the contractually set, lower rate. It may well be that the customer who benefits from that rate has engaged in good faith in precisely the sort of reliance and long-range planning which *Mobile-Sierra* is intended to protect; and where that can be shown, there is no reason to deprive that customer of the benefit of his bargain merely because the utility has acted to disfavor someone else.

In our judgment, the undue discrimination language in the *Sierra* test merely means that a fixed rate *may* be increased in the presence of undue discrimination if doing so *is otherwise consistent* with the policies motivating the *Mobile-Sierra* doctrine.[21] In other words, there is no universal rule as

resulting current differentials have become so vast that some readjustment is needed on grounds of mere magnitude. We have no occasion here to explore or decide this question.

**18.** Brief for petitioner at 31–35. Norwood relies in part on a memorandum prepared after a meeting on the Edison-NEPCO agreement which appears at JA 328. The Town implies that Edison's desire not to extend a similarly low rate to others was a reason for the delay in filing the NEPCO wheeling rate.

**19.** The Commission's December 7, 1976 decision states in part:

Edison originally and NEPCO even to the present attempted to justify this divergent approach of excluding a major portion of Edison's transmission system from the rate on the basis of NEPCO's pre-existing agreement to partially support an Edison 345 Kv line leading from the Canal nuclear generator on Cape Cod to Edison's service area. * * Whatever the original justification for this unique treatment of NEPCO in the Quincy-Weymouth transmission rate, subsequent events * * * have rendered it unreasonable at the present time * * *. * * * There is some question as to the original justification in that all of Edison's 345 Kv facilities, being a part of its fully integrated

transmission system, are used in providing this transmission service. * * * JA 657. The Commission went on to note the usual and proper way of treating cost recovery in wheeling rates and added, "We are, however, pre-empted in this regard by the fixed-rate nature of the Quincy-Weymouth Agreement." JA 658.

**20.** *See* 190 U.S.App.D.C. at ——, 587 F.2d at 1310, *supra.*

**21.** The 7th Circuit recently addressed the general problem of the interrelation of § 205(b) and the *Sierra-Mobile* doctrine and likewise concluded that the mere presence of undue discrimination sufficient to require a remedy does not necessarily—via prong three of the *Sierra* test—require upward revision of the lower, contractual rate. *See Public Service Co. of Indiana, Inc. v. FERC,* 575 F.2d 1204 (7th Cir. 1978). There, four customers were insulated from price increases by *Sierra-Mobile* contracts and a fifth was not. It sought a rate as low as those charged to the other four on § 205(b) grounds. The Commission, which had found that the four lower rates did not meet the three-part *Sierra* test and thus could not be revised upward, declined to lower the higher rate. The 7th Circuit disagreed. It held that

to which rate should be altered in those cases where a valid claim of undue discrimination is raised. Rather, the result turns on the particular facts. If the preference for protecting contractual arrangements that underlies *Mobile-Sierra* seems squarely applicable, discrimination will have to be remedied by reducing the higher rate.[22] On the other hand, if there is some particular rea-

son to depart from that preference—as where there is evidence of some sort of collusive behavior among the contracting parties—it may be more appropriate to conclude that the contractual customer has no entitlement to his fixed rate and that upward revision is therefore appropriate.[23]

■ In the present case, we conclude that the proper disposition is to remand the

---

22. The mere disparity, if not justified by "factual differences," would be unlawfully discriminatory, and remanded. 575 F.2d at 1212. The fact that the Commission had, in the course of its application of the *Sierra* test, found that the lower rates were not unduly discriminatory, the court said, was not dispositive of the discrimination claim under § 205(b). Rather, the court stated that the standard for undue discrimination under § 205(b) differs from that contained in the *Sierra* test and § 206:

> We have already concluded that for purposes of section 205 the difference between the rates charged to Frankfort and the other Cities may be excessively discriminatory. That conclusion does not require, *a fortiori,* the conclusion that the rates are unduly discriminatory under section 206. The purpose behind section 205(b) is the protection of the consumer's interest, * * * and the purpose behind section 206 is the protection of the public interest. * * * Discriminatory rates that are inconsistent with the interests of a consumer need not be inconsistent with the public interest.

575 F.2d at 1213 (citations omitted). In short, the 7th Circuit concluded that it is possible to have discrimination that violates § 205(b) but does not dismantle the protection generally afforded to fixed-rate contracts under *Mobile-Sierra.* Needless to say, we are in complete agreement with this principle, although our analysis is not identical in all particulars. Specifically, our remand with instructions that the record be reopened makes it unnecessary for us to consider now whether a proper and substantiated finding of no undue discrimination for purposes of § 206 and the *Sierra* test leaves room for a finding of some discrimination for purposes of § 205. We note, however, that the need for this distinction arises in large measure from the fact that two analytically distinct issues tend to be collapsed in the third prong of the *Sierra* test. The first concerns the presence of an unduly discriminatory differential and the second the propriety of a particular remedy—disturbing the fixed-price contract—under circumstances where substantial policy grounds disfavor that remedy. The approach we suggest in text will often obviate the problem by bifurcating these issues. Whether this will always be the case is a question we save for another day.

22. The Commission seems to have been under the impression that a reduction in the higher rate was completely foreclosed by the statutory requirement that rates be just and reasonable. We disagree. While we have no quarrel with the theoretical proposition that the just and reasonable standard places some constraint on the extent to which downward revision may be undertaken, we do not think the constraint is as wooden as the Commission approach suggests. First, justness and reasonableness describe a zone of permissible rates, not a single point. Revision to a lower point within that zone would clearly be available as a remedy. *Cf. FPC v. Conway Corp.,* 426 U.S. 271, 278, 96 S.Ct. 1999, 48 L.Ed.2d 626 (1976). Second, the just and reasonable standard itself may in a particular case be capable of considerable sensitivity to rates charged others and general antidiscrimination principles. Third, where the alleged § 205(b) violation is the utility's failure at the time of contract formation to offer similar terms to others, it might be argued that justness and reasonableness should be measured as of that time rather than the present. In one sense, this is what *Sierra-Mobile* provides for those customers with fixed-price contracts. In sum, it seems highly unlikely that the just and reasonable requirement will bar all downward revision of the rate charged to noncontracting parties where such revision would otherwise be appropriate.

23. It is perhaps worth observing that the posture and alignment of the parties also may bear upon the proper remedy. For example, it is possible that revising the upper rate downward in a case otherwise ripe for that approach would turn out to so extend and generalize the low and noncompensatory rate as to impose major burdens on the utility and create a substantial risk that uninvolved customers will wind up subsidizing the windfall received by a sector of the market. Where this is so, extending the low rate in effect converts that rate into one which satisfies the first and/or second prong of the Supreme Court's *Sierra* test. A more appropriate response in these doubtless somewhat rare cases would be to increase the fixed rate.

case to the Commission so that the administrative record may be reopened and Norwood's discrimination claims reconsidered in light of the principles announced in this opinion and in *Chambersburg*. We do so, of course, without expressing any view of the underlying facts or merits beyond the observation that they are in need of further development. And we emphasize that on remand the Commission will have open to it an array of possible remedies and conclusions. In particular, it may conclude that Norwood has failed to produce sufficient evidence to distinguish the present case from *Chambersburg*, and therefore deny relief. Or it may find that there has been undue discrimination and then explore whether the appropriate response is a revision of the Edison-NEPCO agreement or a reduction in the rate offered to Norwood. The choice in the first instance lies with the Commission.

*Remanded.*