CITIES OF BETHANY, BUSHNELL, CAIRO, CARMI, CASEY, FLORA, GREENUP, MARSHALL, METROPOLIS, NEWTON, RANTOUL, AND ROODHOUSE, ILLINOIS, Petitioners,

v.

FEDERAL ENERGY REGULATORY COMMISSION, Respondent, Central Illinois Public Service Company, Illinois Cooperative Group, Intervenors.

CENTRAL ILLINOIS PUBLIC SERVICE COMPANY, Petitioner,

v.

FEDERAL ENERGY REGULATORY COMMISSION, Respondent, Cities of Bethany, et al., Intervenors.

ILLINOIS COOPERATIVE GROUP, Petitioner,

v.

FEDERAL ENERGY REGULATORY COMMISSION, Respondent, Central Illinois Public Service Co., Illinois Municipal Group (Cities of Bethany, et al.), Intervenors.

Nos. 82–2168, 82–2189, 82–2301.

United States Court of Appeals, District of Columbia Circuit.

Argued 22 Sept. 1983.

Decided 7 Feb. 1984.

Charles F. Wheatley, Washington, D.C., with whom Woodrow D. Wollesen and William Steven Paleos, Washington, D.C., were on the brief, for Cities of Bethany, et al., petitioners in No. 82–2168 and intervenors in Nos. 82–2189 and 82–2301.

Richard D. Avil, Jr., Cleveland, Ohio, with whom Paul T. Ruxin, Chicago, Ill., was on the brief, for Central Illinois Public Service Co., petitioner in No. 82–2189 and intervenor in Nos. 82–2168 and 82–2301. Brian F. Toohey, Cleveland, Ohio, also entered an appearance for Central Illinois Public Service.

Grace Powers Monaco, Washington, D.C., for Illinois Cooperative Group, petitioner in No. 82–2301 and intervenor in Nos. 82–2168 and 82–2189.

Andrea Wolfman, Atty., F.E.R.C., Washington, D.C., with whom Barbara J. Weller, Deputy Sol., and Thajauna D. Miller, Atty.,

F.E.R.C., Washington, D.C., were on the brief, for respondent.

Before WILKEY and WALD, Circuit Judges, and MacKINNON, Senior Circuit Judge.

Opinion for the Court filed by Circuit Judge WILKEY.

WILKEY, Circuit Judge:

Petitioners seek review of two orders of the Federal Energy Regulatory Commission ("FERC" or "the Commission") pertaining to a wholesale rate filing made by Central Illinois Public Service Company ("CIPS") in 1979.[1] The three sets of petitioners are: CIPS, which is a utility that sells electrical power at wholesale; a group of twelve Illinois cities ("the Cities"), all of which are wholesale customers of CIPS;[2] and the Illinois Cooperative Group ("the Coops"), which is comprised of rural cooperatives that also purchase electricity at wholesale from CIPS. Each of the three sets of petitioners challenges different aspects of FERC's orders.

We affirm FERC in all respects except for its interpretation of the contracts between CIPS and four of its municipal customers. We reverse FERC's determination that the rates under the contracts must be applied prospectively only, from the date of FERC's order in this case.

## I. BACKGROUND

On 2 November 1979 CIPS made a wholesale rate filing with FERC. The rate filing sought rate increases for CIPS's three classifications of wholesale customers: the Coops in group W–1; the full requirements city customers in W–2; and the partial requirements city customers in W–3. Prior to this contested rate filing, CIPS historically had charged the same rate to its W–1 customers (Coops) as it did to its W–2 customers (full requirements cities), despite their separate customer classifications. CIPS's 1979 wholesale rate filing, however, sought a greater increase in the rates to be charged to the W–2 city customers than it did for the rates to be charged to the W–1 cooperative customers.[3]

In accordance with contracts between CIPS and the Coops, CIPS had given the Coops six months' advance notice of its proposed wholesale rate filing. Pursuant to this advance notice, CIPS and the Coops entered into settlement negotiations, which resulted in the Coops' agreeing not to challenge the proposed rate filing at FERC. Contracts between CIPS and the Cities did not contain a similar notice provision and CIPS merely gave the Cities the more limited, 60 days' notice required by the Federal Power Act.[4]

Because the Coops had agreed to the proposed rate increase in advance, the Commission permitted the W–1 rate to take effect without suspension. FERC, however, imposed a suspension on the effective date of the W–2 and W–3 rate increases, and then proceeded to investigate the propriety of those proposed rates under the Federal Power Act. A hearing on CIPS's proposed increases in rates charged to the Cities was held before an Administrative Law Judge, at which hearing CIPS, the Cities, and FERC's staff all participated.

In the proceedings the Cities challenged the justness and reasonableness of the W–2 and W–3 rates, and also charged that CIPS's proposed rates were unlawfully discriminatory because of the disparity between the rates to be charged to the Coops and the Cities. The Cities further claimed that CIPS's proposed change to a new method of allocating fixed costs among customers was not reasonable. In addition, the

---

1. *Central Illinois Public Service Co.*, Opinion No. 142, 20 FERC (CCH) ¶ 61,043 (1982); *Central Illinois Public Service Co.*, Opinion No. 142–A, 20 FERC (CCH) ¶ 61,435 (1982).

2. The twelve cities are: Bethany, Bushnell, Cairo, Carmi, Casey, Flora, Greenup, Marshall, Metropolis, Newton, Rantoul, and Roodhouse, Illinois.

3. *See* Joint Appendix (J.A.) at 698, 808–09.

4. *See* 16 U.S.C. § 824d(d) (1982).

Cities raised several miscellaneous cost-of-service issues. The ALJ's Initial Decision of 2 March 1981 concluded that the differential between rates for the Coops and the Cities was unduly discriminatory, and that the CIPS's proposed use of a "3–CP" method of allocating costs was not reasonable.[5] The ALJ ruled against the Cities on several miscellaneous cost-of-service issues.

Exceptions to the Initial Decision were filed with the Commission by CIPS and the Cities. In addition, the Coops were permitted to intervene in the proceedings before FERC in support of CIPS's position, which urged the Commission to reverse the ALJ's rejection of CIPS's proposed method of allocating costs. In addition, four of the Cities made the argument, not previously made to the ALJ, that the proposed rate increase could not be applied to them, because their private contracts with CIPS prohibit unilateral rate filings.

On 12 July 1982 the Commission affirmed in part and reversed in part the ALJ's Initial Decision, and FERC's order established the just and reasonable rates that CIPS was permitted to charge.[6] FERC affirmed the ALJ's decision with respect to the demand cost allocation method and several miscellaneous cost-of-service issues. While adopting the ALJ's findings of fact on the discrimination claim, however, FERC determined that the rate differential between the Cities and the Coops was not unduly discriminatory, overruling the ALJ on that point. Finally, FERC interpreted the contracts between four municipal customers and CIPS as prohibiting unilateral rate filings by CIPS. It construed those contracts to provide that FERC itself would establish rates under the contract when the parties failed to agree on specific rates, and that those established rates could only be applied prospectively. Accordingly, it ordered CIPS to refund to the four cities the increases in rates collected from the four Cities from the time of the effective date of CIPS's unilateral filing to the date of the Commission's order setting the reasonable rates in this case.

On 30 September 1982 FERC issued a subsequent order, in which it denied applications for rehearing and it further explained its determinations on the discrimination and contract issues.[7] Petitioners petitioned this court for review of those two orders of the Commission.

## II. Analysis

### A. The Cost Allocation Method

A principal element in CIPS's rate schedule is the demand charge, which allocates fixed costs among customers. CIPS's 1979 rate filing proposed to allocate fixed costs among customers based on each customer's demand for electricity during CIPS's peak sales months of June, July and August. This method of cost allocation is known as a 3–CP method, because of its use of a coincident peak of three months. Prior to its 1979 filing, CIPS had used a 12–CP method, which apportioned fixed costs among customers based on each customer's demand for electricity in each of twelve months. Because the Cities' purchases of electricity are the greatest during the summer months and the Coops' demand peaks in the winter, CIPS's proposed use of the 3–CP method would have resulted in a higher proportion of fixed costs being allocated to the Cities than was allocated to them under the previously employed 12–CP method.

The Commission affirmed the ALJ's conclusion that CIPS's proposed use of a 3–CP method of allocating costs among classes of customers was not reasonable. On review, the Coops argue that FERC and the ALJ used an incorrect legal standard to assess the propriety of CIPS's proposed use of a

---

5. *Central Illinois Public Service Co.,* Initial Decision, Docket No. ER80–71 (2 March 1981), J.A. at 696.

6. Opinion No. 142, 20 FERC (CCH) ¶ 61,043 (1982).

7. Opinion No. 142–A, 20 FERC (CCH) ¶ 61,435 (1982).

3–CP cost allocation method.[8] CIPS contends that FERC's decision on the demand cost allocation method is not supported by substantial evidence on the record considered as a whole. Both FERC and the Cities take the position that FERC made a reasonable policy determination on the proper cost allocation method and that FERC's decision is supported by substantial evidence on the record considered as a whole.

■ The Coops' contention that the ALJ erred by requiring CIPS to prove that the proposed 3–CP method was *more* reasonable than the 12–CP method is not correct; neither the ALJ nor FERC employed that standard. The Federal Power Act requires that all rates charged by public utilities be "just and reasonable." [9] In the past FERC has interpreted its authority to review rates under this provision of the Act as limited to an inquiry into whether the rates proposed by a utility are reasonable—and not to extend to determining whether a proposed rate schedule is more or less reasonable than alternative rate designs.[10] Adopting the usual standard, the ALJ determined, and the Commission agreed, that CIPS only bore a burden to demonstrate that its proposed 3–CP method of allocating costs was reasonable; CIPS was not required to prove

that its proposed 3–CP method was *more* reasonable than the 12–CP method which it had previously employed. The ALJ stated:

> [T]he standard for the decision is . . . not whether a 12 CP method is more appropriate than a 3 CP method, but rather whether the 3 CP method is reasonable and adequate.[11]

The ALJ did not put a burden on CIPS to prove that its proposed cost allocation method was superior to alternative allocation methods.[12] FERC's decision did not adopt an incorrect legal standard for assessing the propriety of CIPS's proposed use of a 3–CP method of allocating costs under the Federal Power Act.

■ Furthermore, the application of the proper legal standard to a proposed cost allocation method involves important policy choices about how costs of services should be allocated among customers.[13] Under the 3–CP method, fixed costs are allocated on the basis of a customer's contribution to the system's peak demand; the premise of this method is that fixed costs such as plant size are determined by the demand on the system during the three peak months. The 12–CP method, by contrast, assumes that a utility's fixed costs principally relate to the demand on the utility throughout the year,

**8.** FERC contends that the Coops lack standing to petition for review of FERC's decision on the reasonableness of CIPS's cost allocation method. Brief for Respondent at 38–39. We find that the Coops are sufficiently aggrieved by the Commission's orders to be proper petitioners before this court. Section 313(b) of the Federal Power Act, 16 U.S.C. § 825*l*(b) (1982) grants standing to "[a]ny party to a proceeding under this chapter aggrieved by any order issued by the Commission in such proceeding." The Commission permitted the Coops to intervene in this case when the cost allocation issue was before the Commission. The Coops' settlement agreement with CIPS does not deprive them of standing to seek review of FERC's order rejecting CIPS's proposed use of a 3–CP method of allocating costs. Although the rate design settled upon by CIPS and the Coops in 1979 utilized a 3–CP cost allocation method, FERC's requirement that CIPS use a 12–CP cost allocation method is likely to affect rates charged to the Coops. Costs allocated to the Coops by the Commission's mandated 12–CP method are not reflected in the Coops' settlement rates. Indeed, in November of 1982, immediately after

FERC issued its final order in this case, CIPS filed to increase its rates to the Coops. *See Central Illinois Public Service Co.,* Docket No. ER83–78–000.

**9.** 16 U.S.C. § 824d(a) (1982) ("rates or charges shall be just and reasonable").

**10.** *See Public Service Co. of Indiana,* 56 FPC 3003 (1976).

**11.** Initial Decision at 5; J.A. at 701.

**12.** Furthermore, even if the ALJ had used a relative reasonableness approach in evaluating the proposed cost allocation method, such a standard may be proper. *See, e.g., Idaho Power Co.,* 3 FERC (CCH) ¶ 61,108 at 61,301–03 (1978) (Holden, Commissioner, concurring) (inquiries into the "relative reasonableness" of other proposed methods are not contrary to the Federal Power Act).

**13.** *See Cities of Batavia v. FERC,* 672 F.2d 64, 80–83 (D.C.Cir.1982).

and not to the maximum load on the system during its months of peak demand.[14] Because each utility is unique, FERC has eschewed a rigid approach in assessing whether a proposed method of allocating fixed costs among customers is reasonable. In this case the Commission found that a method of allocating costs based on CIPS's three peak summer months was not reasonable, because there was a high demand on CIPS's system throughout the year.[15] The Commission's policy determination that the 3–CP method is not reasonable under the facts of this case warrants substantial deference from this court.[16] We find that the standard used by the ALJ and FERC in this case was proper.

The Coops further allege that the ALJ made an error of law by failing to heed the views of the Illinois Commerce Commission when he evaluated the reasonableness of CIPS's proposed cost allocation method. Nothing in the Public Utility Regulatory Policies Act, however, requires FERC to adopt the views of state rate-setting commissions when the Commission evaluates the reasonableness of rates that a utility may charge to wholesale customers.[17] Indeed, FERC has expressly held that the Commission is not bound to use the same allocation method established by the state.[18] The Coops' challenge to this aspect of FERC's order is not meritorious.

Furthermore, FERC's determination that CIPS's proposed 3–CP method was unreasonable is supported by substantial evidence in the record considered as a whole. The ALJ's Initial Decision found as matters of fact that CIPS did not have a summer peak demand that was significantly greater than its winter demand and that CIPS's system had a high level of use throughout the year.[19] The ALJ's decision is supported by his detailed study of CIPS's load characteristics and trends as well as of CIPS's scheduled maintenance.[20] FERC's adoption of the ALJ's determination that a 3–CP method would place an undue emphasis on CIPS's capacity utilization in the summer months is supported by substantial evidence in the record considered as a whole.

B. *The CIPS's Allegedly Undue Discrimination Between Wholesale Customers*

The Federal Power Act prohibits a public utility from discriminating unduly among customers with respect to rates and service. Section 205(b) of the Federal Power Act provides:

> No public utility shall, with respect to any transmission or sale subject to the jurisdiction of the Commission, (1) make or grant any undue preference or advantage to any person or subject any person to any undue prejudice or disadvantage, or (2) maintain any unreasonable difference in rates, charges, services, or in any other respect, either as between localities or as between classes of service.[21]

The Cities contend that the separation of CIPS's wholesale customers into W–1 and W–2/W–3 categories as well as the disparity in rates charged to the separate customer classifications violate section 205(b)'s anti-discrimination mandate. FERC held that neither the customer classifications nor the rates were unduly discriminatory within the meaning of the Federal Power Act. The Cities seek review of both aspects of FERC's ruling on the discrimination issue.

---

**14.** *See id.; Wisconsin Michigan Power Co.*, 31 FPC 1445, 1455 (1964).

**15.** *See* Opinion No. 142 at 13; J.A. at 709.

**16.** *See Colorado Interstate Gas Co. v. FPC*, 324 U.S. 581, 589, 65 S.Ct. 829, 833, 89 L.Ed. 1206 (1945).

**17.** *See* 16 U.S.C. § 2612(b) (1982). Title I, section 102, of PURPA provides, in part:
The requirements of this chapter do not apply to the operations of an electric utility ...

to the extent that such operations ... relate to sales of electric energy for purposes of resale.
*Id.*

**18.** *See Alabama Power Co.*, 8 FERC (CCH) ¶ 61,083 at 61,327 (1979).

**19.** *See* Initial Decision at 5–13; J.A. at 701–09.

**20.** *See* Initial Decision at 3–14; J.A. at 699–710.

**21.** 16 U.S.C. § 824d(b) (1982).

### 1. The Customer Classifications

In upholding CIPS's W–1 (Coop) and W–2 (Cities) customer classifications, FERC stated that the Federal Power Act permits utilities to use reasonable classifications "based on differences in characteristics having cost of service implications." [22] FERC found cost-of-service differences between the Cities and the Coops, such as their different peaking times and their general customer profiles.[23] Furthermore, FERC noted that the separation of wholesale customers into separate municipal and cooperative groups was a widely used practice in the industry.

The Cities contend that FERC's approval of separate customer classifications for the Coops and the Cities is arbitrary and unreasonable. They claim that CIPS's classification method should be based on the specific characteristics of individual customers. For example, the Cities argue that some of the Coops are summer-peaking customers with cost-of-service characteristics more similar to the Cities than to other Coops. CIPS's classifications, which are based on general characteristics, are unreasonable and unduly discriminatory under section 205(b) of the Federal Power Act, according to the Cities.

While classification of customers based on individual characteristics might produce more finely adjusted rates and more scientific results, FERC may properly grant the utilities reasonable latitude in setting rate classifications based on general characteristics of customer groups. As this court noted in *Alabama Electric Cooperative v. FERC*,[24] ratemaking is less a science than it is an art. Substantial deference must be given to FERC's judgment on the reasonableness of particular customer categories. Reviewing courts have upheld FERC's approval of separate customer cate-gories when those categories reflected general characteristics of customer classes with cost-of-service implications.[25] Because the Cities and the Coops have different customer profiles and load characteristics, the separation of the Cities and the Coops into W–1 and W–2/W–3 customer classifications is not unduly discriminatory.

### 2. The Rate Disparity

The Cities make the additional charge that the disparity between their rates and the rates charged to the Coops pursuant to the Coops' negotiated settlement with CIPS renders CIPS's rates unduly discriminatory under section 205(b). The ALJ found that there were no cost factors that warranted a departure from CIPS's historical practice of charging identical rates to the W–1 and W–2 customer classifications.[26] FERC similarly found that the rate disparity was not the product of actual cost-of-service differences between the two categories, but was solely the result of the settlement agreement between CIPS and the Coops.[27]

Despite the absence of a cost justification for the rate disparity, however, FERC held that the rate differences were not unduly discriminatory. The Commission noted that the rate difference was only temporary, because the settlement agreement which resulted in lower rates for the Coops only pertained to the 1979 rate filing by CIPS. Most of the rate difference would be eliminated by CIPS's use of a 12–CP method for the Coops' rates instead of the 3–CP method agreed upon by the Coops prior to the contested rate filing. FERC reasoned that when a temporary difference in rates between customer categories is the result of a settlement agreement that does not involve bad faith or improper conduct, the difference is lawful, provided that there is no evidence of actual competitive harm or un-

---

**22.** Opinion No. 142 at 5; J.A. at 810.

**23.** The Cities' customer profile is concentrated on general service customers with heavy air conditioning loads. The Coops, by contrast, service mainly rural and farm customers. Opinion No. 142 at 5–6; J.A. at 810–11.

**24.** 684 F.2d 20, 27 (D.C.Cir.1982).

**25.** *See, e.g., St. Michaels Utilities Commission v. FPC*, 377 F.2d 912, 916 (4th Cir.1967).

**26.** Initial Decision at 45; J.A. at 741.

**27.** Opinion No. 142 at 11; J.A. at 816.

due burden to a customer group.[28] It found neither improper conduct nor evidence of anti-competitive harm.

The Cities challenge FERC's opinion for three reasons. First, they allege that CIPS's advance settlement with the Coops was the product of bad faith and improper conduct. Second, the Cities contend that even if the settlement was properly negotiated, the prior settlement agreement does not legitimize the size of the particular rate differential between the Coops and the Cities. Third, the Cities claim that FERC erred by requiring the Cities to bear the burden of showing anti-competitive effects. We find each of these contentions to be without merit.

 The mere fact of a rate disparity between the Cities and the Coops does not establish unlawful rate discrimination under section 205(b) of the Federal Power Act. Rate differences may be justified and rendered lawful by "facts—cost of service or otherwise." [29] Because the preservation of private contracts within the context of a rate-setting statutory scheme promotes economic stability, the Supreme Court held, in the *Mobile* and *Sierra* cases, that statutory provisions governing public utilities' rates should be construed, when possible, as compatible with private rate agreements.[30] Likewise, this court noted in *Town of Norwood v. FERC* that the anti-discrimination mandate of section 205(b) should not be read to obliterate the public policy supporting private rate contracts between utilities and their customers.[31] A fixed rate contract between the parties may justify a rate disparity, rendering it lawful under section 205(b).[32]

 Settlement agreements between a utility and a customer, however, may not be completely analogous to fixed rate contracts. In the settlement agreement between the Coops and CIPS, the parties did not set electricity rates for specified terms of years. Instead, the Coops and CIPS agreed that the Coops would not challenge CIPS's unilateral rate filing with FERC and that CIPS would charge the Coops the settled rate until such time as CIPS made another rate filing at FERC. Nonetheless the policies articulated in *Mobile* and *Sierra* support treating a settlement agreement as a factual difference that may justify a rate disparity under section 205(b). Like fixed rate contracts, settlements promote market stability and reduce litigation over rate filings under the Federal Power Act. As FERC has noted, settlements would be severely discouraged, if not eliminated, if any resulting price disparities among customers were considered unlawfully discriminatory within the meaning of section 205(b).[33] When a settlement is reached in good faith, by means of proper conduct by the parties, and when the resulting rate disparity is not unduly burdensome to a customer group, a rate difference caused by a private settlement may survive the anti-discrimination mandate of section 205(b).

 Rate disparities resulting from a private rate arrangement are lawful only when the agreement was reached through

28. *See, e.g., Boroughs of Chambersburg v. FERC,* 580 F.2d 573 (D.C.Cir.1978) (per curiam).

29. *St. Michaels Utilities Commission v. FPC,* 377 F.2d 912, 915 (4th Cir.1967). *See Towns of Alexandria v. FPC,* 555 F.2d 1020, 1027–28 & n. 41 (D.C.Cir.1977).

30. *See United Gas Pipe Line Co. v. Mobile Gas Service Corp.,* 350 U.S. 332, 344, 76 S.Ct. 373, 380, 100 L.Ed. 373 (1956); *FPC v. Sierra Pacific Power Co.,* 350 U.S. 348, 76 S.Ct. 368, 100 L.Ed. 388 (1956).

31. 587 F.2d 1306, 1310 (D.C.Cir.1978).

32. *See Boroughs of Chambersburg v. FERC,* 580 F.2d 573, 577 (D.C.Cir.1978) (per curiam).

33. *See Delmarva Power & Light Co.,* 6 FERC (CCH) ¶ 61,084 at 61,162 (1979) (If rate settlements cannot survive the anti-discrimination mandate of the Act, "[n]o utility company could afford to risk anything less than a full and complete settlement with all its customers. . . . [I]ndividual customers would have no incentive to settle . . . ."). *See also Boroughs of Chambersburg v. FERC,* 580 F.2d 573 (D.C. Cir.1978) (per curiam).

fair conduct and good faith by the parties.[34] The Cities attack the rate disparity here because, they claim, CIPS's settlement was a "sweetheart" deal between CIPS and the Coops, characterized by unequal notice of the proposed rate increases and unequal opportunities to negotiate with CIPS over rates.[35] The ALJ found, however, and FERC concurred that CIPS gave advance notice only to the Coops because only the Coops had secured an advance notice requirement in their contracts with CIPS. The Cities, by contrast, had neither sought nor secured an advance notice provision in their contracts with CIPS. We find no error in the Commission's finding that the advance negotiations between the Coops and CIPS which resulted in the settlement agreement were neither improper nor conducted in bad faith.

We are persuaded that FERC's finding of proper conduct resulting in a settlement is supported by substantial evidence on the record considered as a whole. CIPS bore the risk that its revenues would be diminished by a FERC determination that CIPS's rate filing for the Cities, which matched the rate design settled upon in advance with the Coops, would not be found just and reasonable under the Federal Power Act. As FERC stated:

> What CIPSCO did was not so much discriminatory as it was risky. CIPSCO was free to negotiate a settlement with the cooperatives, but in doing so took the risk that separate settlement efforts with the cities would fail and that this Commission, in determining just and reasonable rates for service to the cities, would allocate costs to the cooperative service that were not reflected in the W–1 settlement

rates. This in fact is what has happened.[36]

We affirm FERC's holding on this issue.

■ Second, the Cities claim that even if the Coops' settlement agreement warrants a rate disparity among customer categories, it does not justify the specific rate disparity here. We disagree. Under section 205(b), factual differences between customers should justify the particular rate disparity at issue in order to render a rate difference lawful.[37] As FERC noted, the rate disparity here was only temporary, because CIPS retained the right to file a new rate schedule with FERC to increase its rate of return from the Coops. Indeed, subsequent to FERC's final order in this case, CIPS proposed a unilateral rate filing to increase its W–1 (Coop) rates.[38] Nor was the size of the differential disproportionate to the factual difference of the settlement agreement. FERC's finding that the settlement agreement justifies the rate differential is not improper.

Finally, the Cities claim that FERC erred by its refusal to presume anti-competitive effects from the rate disparity in this case. FERC held that the Cities had the burden to show anti-competitive effects and that they failed to prove any competitive burden under section 205(b). On review, the Cities argue that prior FERC precedent requires that anti-competitive effects be presumed in this case.

FERC's refusal to presume anti-competitive effects in this case is not a departure from prior precedent.[39] The Cities' reliance on FERC's presumption of anti-competitive effects in a price squeeze context is misplaced. The price squeeze cases, in which anti-competitive effects are presumed to result from price discrimination, originally arose under the antitrust laws.[40] The anti-

---

**34.** *Town of Norwood v. FERC,* 587 F.2d 1306, 1313–14 (D.C.Cir.1978).

**35.** *See* Brief of Petitioner Cities of Bethany at 24–31.

**36.** Opinion No. 142 at 11; J.A. at 816.

**37.** *See Public Service Co. of Indiana v. FERC,* 575 F.2d 1204, 1212 (7th Cir.1978).

**38.** *Central Illinois Public Service Co.,* Docket No. ER83–78–000 (1983).

**39.** *See, e.g., City of Frankfort, Indiana v. FERC,* 678 F.2d 699, 707 & n. 16 (7th Cir.1982).

**40.** *See United States v. Aluminum Co. of America,* 148 F.2d 416 (2d Cir.1945); *Cities of Batavia v. FERC,* 672 F.2d 64, 86 (D.C.Cir.1982).

competitive danger in price squeeze situations is that a dominant utility supplier which competes with a wholesale customer in a retail market will charge such high rates to the wholesale customer that the customer can no longer compete with the utility in the retail market. When a utility competes with a wholesale customer in a retail market, FERC presumes anti-competitive effects from a rate disparity that burdens the customer-competitor.[41] In this case, however, no factual allegation has been made that CIPS, by charging different wholesale rates to the Coops and the Cities, is trying to gain a competitive advantage over the Cities in a retail market which both CIPS and the Cities occupy. Any anti-competitive danger from the rate disparity here is considerably more attenuated than is the harm in a price squeeze situation. FERC did not err by refusing to follow the rule in the price squeeze cases, which presume that anti-competitive effects will result from rate discrimination.

 The general FERC rule, to which the price squeeze cases are the exception, is that anti-competitive danger must be proved in order to invalidate an otherwise reasonable rate disparity. In *Boroughs of Chambersburg v. FERC,* for example, this court stated that a rate disparity resulting from a contract entered into in good faith was not unduly discriminatory under section 205(b) "if *nothing else is demonstrated.*"[42] And in *City of Frankfort, Indiana v. FERC,* the court noted that *evidence* of competitive harm could render a rate disparity undue.[43] FERC did not deviate from precedent under section 205(b) by its ruling that anti-competitive effects should not be presumed to result from the rate disparity between the Cities and the Coops.

## C. *The Casey Group Contracts*

The third major challenge to FERC's orders pertains to FERC's interpretation of contracts between CIPS and four of its municipal customers. This contract claim arose after the ALJ had issued his Initial Decision, when the cities of Casey, Flora, Greenup, and Newton (the "Casey Group") filed motions with the Commission to prevent the rate increases under CIPS's unilateral rate filing from being applicable to them. The Casey Group sought a refund of all increased revenues collected from them since the effective date of CIPS's unilateral rate filing.

The contracts at issue were executed by the Casey Group cities and CIPS in 1965. The contracts were filed with the Federal Power Commission[44] and took effect on 1 September 1965. The contracts specify the applicable rates to be charged for the first ten years of the contracts and state that the rates and charges for the second ten years of the contracts' term shall be mutually agreed upon by the parties. The contracts contain the following provision:

> The term of this agreement shall be for a period of 20 years from and after the effective date hereunder; provided however, that the rates and charges for service hereinbefore set forth shall apply only during the first ten years of the period, and the rates and charges for the second ten years of the period shall be mutually agreed to by both parties subject to the approval of the regulatory body or bodies as may have jurisdiction thereof.[45]

The Casey Group cities and CIPS have not mutually agreed upon rates and charges for the second ten years of the contracts' duration. In 1975, the first of the second ten years, CIPS notified the Casey Group cities that it planned to make a unilateral rate

---

**41.** *See* 18 C.F.R. § 2.17 (1983). *See also Illinois Cities of Bethany v. FERC,* 670 F.2d 187, 194–200 (D.C.Cir.1981).

**42.** 580 F.2d at 578 (emphasis in original).

**43.** 678 F.2d 699, 707 & n. 16 (7th Cir.1982). *See also Southwestern Electric Power Co.,* 4 FERC (CCH) ¶ 61,330 at 61,768 (1978).

**44.** Functions of the Federal Power Commission were transferred to the Federal Energy Regulatory Commission in 1977. *See* 42 U.S.C. § 7172(a) (Supp. V 1981).

**45.** Opinion No. 142 at 13; J.A. at 818.

increase filing with FERC, which filing would apply to the rates charged to the Casey Group cities. At that time the Casey Group cities did not challenge CIPS's right to make a unilateral rate filing pursuant to the contracts, and they likewise failed to challenge CIPS's use of the statutory method of unilateral filings in subsequent years. Their first claim that their contracts precluded unilateral rate filings was made by motion to the Commission in January of 1982.

FERC found that the Casey Group contracts were fixed rate agreements for the first ten years of the contracts' term and "agreements to agree" for the second ten years.[46] It relied on general contract principles and the Uniform Commercial Code to determine the rights and obligations of the parties when they fail mutually to agree. Finding that the specific contract provision constituted an open price term, FERC followed the rule of the U.C.C. for setting prices in open price terms. Section 2–305 of the U.C.C. states than an open price shall be fixed at the "reasonable price at the time of delivery."[47] FERC determined that the "reasonable price" was the W–2 (Cities) rate established by FERC in its order. It further interpreted the contracts to prohibit rate increases by means of unilateral rate filings, and held that the rate increases could take effect prospectively only, from the date of FERC's order. It ordered CIPS to refund to the Casey Group cities the increased revenues collected from the four cities between the effective date of the unilateral filing and the date of the Commission's order.[48]

The Casey Group cities and CIPS each challenge different aspects of FERC's interpretation of their contracts. The Casey Group cities contend that the rates specified in the contracts for the first ten years must continue in effect during the second ten years, unless the parties mutually agree to new rates.[49] CIPS contends that the Commission erred by interpreting the contracts to prohibit CIPS from making unilateral rate filings. CIPS contests FERC's order requiring CIPS to refund the increased revenues collected by CIPS from the Casey Group cities since the effective date of the unilateral rate filing.

■ Under the Supreme Court's *Mobile-Sierra* doctrine, contracting parties may determine for themselves when and how existing rates may be altered, subject to FERC's power to adjust rates in the public interest.[50] The principal inquiry in rate-setting contract disputes is to divine the intent of the parties to the contract as to how rates are to be set.[51] A determination of the parties' intent must begin with a close textual analysis of the contract provision at issue.[52]

The wording of the provision here clearly distinguishes between the rates for the first ten years of the contracts and those for the second ten years. The provision states that the rates specified in the contracts are to remain in effect "*only* during the first ten years."[53] The plain language of the contracts belies the Casey Group cities' position that, absent mutual agreement on rate increases, the rates specified for the years 1965–75 must continue in effect for the second ten years of the contracts. The language of the contracts makes clear that the parties did not intend to make the 1965 rates continue in effect between 1975 and 1985.

---

**46.** Opinion No. 142 at 15–16; J.A. at 820–21.

**47.** U.C.C. § 2–305 (1972).

**48.** *See* Opinion No. 142 at 18; J.A. at 823.

**49.** If, however, the rates for the first ten years as applied to the second ten years were so low as to affect the public interest adversely, FERC could adjust the rates under section 206, according to the Casey Group cities' interpretation of the contracts.

**50.** *See City of Oglesby v. FERC,* 610 F.2d 897, 902–03 (D.C.Cir.1979).

**51.** *City of Piqua, Ohio v. FERC,* 610 F.2d 950, 953–54 n. 11 (D.C.Cir.1979).

**52.** *See Papago Tribal Utility Authority v. FERC,* 723 F.2d 950 (D.C.Cir.1983).

**53.** Opinion at 13; J.A. at 818 (emphasis added).

It thus becomes necessary to determine the rights and obligations of the parties under the contracts when the specified rates for the first ten years terminate and the parties fail mutually to agree on rates for the subsequent years. Rather than substituting the U.C.C.'s rule for open price terms in contracts for the sale of goods by merchants, it seems more reasonable to construe these contracts by reference to the backdrop of statutory schemes for establishing rates under the Federal Power Act. The *Mobile-Sierra* doctrine sets the principles by which we must reconcile the contracts' open rate term with the rate-setting provisions of the Federal Power Act. As this court has observed:

> [T]he *Mobile-Sierra* doctrine "is refreshingly simple: The contract between the parties governs the legality of the filing. Rate filings consistent with contractual obligations are valid; rate filings inconsistent with contractual obligations are invalid." [54]

We turn now to the statutory scheme to determine what rate filings are consistent with the contracts' rate provision.

The Federal Power Act contains two basic methods for changing electricity rates. Under section 205, a utility may unilaterally file a rate change with FERC, which rate takes effect immediately after a sixty days' notice requirement has been satisfied. The effective date of a unilateral rate filing, however, is subject to a possible suspension of no longer than five months, if FERC orders an investigation into whether proposed rate changes are just and reasonable as required by the Act.[55] Alternatively, under section 206, FERC itself may establish the just and reasonable rate, provided that it first determines that a rate set by a public utility is unjust, unreasonable, or unduly discriminatory.[56] When FERC determines the just and reasonable rate under section 206, the established rate takes effect prospectively only from the date of the FERC's order setting the rate.[57]

We thus must decide whether the parties intended to permit CIPS to use the section 205 method of rate-setting, with its immediate effective date, or the section 206 method of rate-setting by FERC, which takes effect only after FERC issues its order setting a just and reasonable rate. The language of the contract provisions at issue here are consistent with permitting section 205 filings when the parties fail mutually to agree on rates. Open rate terms in contracts may properly be interpreted to permit a utility unilaterally to file rates under section 205.[58] Furthermore, the language in the contract providing that rates shall be

---

**54.** *Papago Tribal Utility Authority v. FERC,* 610 F.2d 914, 929 (D.C.Cir.1980) (quoting *Richmond Power & Light v. FPC,* 481 F.2d 490, 493, *cert. denied,* 414 U.S. 1068, 94 S.Ct. 578, 38 L.Ed.2d 473 (1973)).

**55.** Section 205, 16 U.S.C. § 824d(a), (d) & (e) (1982), provides:

> (a) All rates and charges made ... by any public utility for or in connection with the transmission or sale of electric energy ... shall be just and reasonable, and any such rate or charge that is not just and reasonable is hereby declared to be unlawful.
> (d) [N]o change shall be made by any public utility in any such rate ... except after sixty days' notice to the Commission and to the public. Such notice shall be given by filing with the Commission ... new schedules stating plainly the change or changes to be made ....
> (e) Whenever any such new schedule is filed the Commission shall have authority ... to enter upon a hearing concerning the lawfulness of such rate ... and, pending such hearing and the decision thereon, the Commission ... may suspend the operation of such schedule and defer the use of such rate ... but not for a longer period than five months beyond the time when it would otherwise go into effect ....

**56.** Section 206(a), 16 U.S.C. § 824e(a) (1982) provides:

> (a) Whenever the Commission, after a hearing had upon its own motion or upon complaint, shall find that any rate ... is unjust, unreasonable, unduly discriminatory or preferential, the Commission shall determine the just and reasonable rate ... to be thereafter observed and in force, and shall fix the same by order.

**57.** *See id.; FPC v. Sierra Pacific Power Co.,* 350 U.S. 348, 353, 76 S.Ct. 368, 371, 100 L.Ed. 388 (1956); *Papago Tribal Utility Authority v. FERC,* 610 F.2d 914, 923–26 (D.C.Cir.1979).

**58.** *See, e.g., Borough of Lansdale, Pa. v. FPC,* 494 F.2d 1104, 1106 n. 2 (D.C.Cir.1974).

agreed upon by the parties "subject to the approval of the regulatory body" is also consistent with section 205 filings. FERC's authority under section 205 to suspend and investigate rates filed under section 205 has been interpreted as the authority to "approve" rates.[59] Furthermore, FERC's tendency in recent years to require an explicit expression in private contracts of the parties' intention to permit unilateral filings under section 205 is not highly relevant to the meaning of a provision executed in 1965.[60]

Not only are the terms of the contracts consistent with a section 205 method of rate setting, but the parties' conduct throughout the pertinent period of the contracts is probative of the parties' intent and of the fair meaning of the contracts. The parties' course of performance under a contract may give meaning to otherwise unclear contract terms.[61] In this case, rates for the Casey Group cities were established by CIPS's unilateral rate filings under section 205 from 1975 to early 1982—almost seven of the second ten years of the contracts' term. During that time, the Casey Group cities did not protest CIPS's use of section 205's method of rate setting. This prolonged participation by the Casey Group cities and CIPS in a method of fixing rates when the parties failed mutually to agree on specific charges is highly instructive as to the fair meaning of the Casey Group contracts.

▋ Accordingly, we hold that the contracts' rate-setting provision contemplates section 205 filings when the parties fail to agree on rates during the second ten years. Under the contracts, therefore, the W–2 rates as adjusted by FERC's opinion in this case should take effect on the effective date of CIPS's filing.

### D. Miscellaneous Cost-of-Service Issues

The Cities make additional challenges to FERC's orders. They claim that FERC erred by summarily affirming the ALJ on certain miscellaneous cost-of-service issues without specifically addressing the Cities' arguments. The Cities contend that this procedure violates the Administrative Procedure Act.

▋ The Administrative Procedure Act requires that agencies supply "findings and conclusions, and the reasons or basis therefor, on all the material issues of fact, law or discretion presented on the record."[62] An agency is required to provide an explanation of the basis for its actions in order to provide a considered response to the losing party and an opportunity for intelligent review by the courts.[63] The ALJ's detailed and thorough 60-page Initial Decision sufficiently addresses the Cities' losing arguments on the miscellaneous cost-of-service issues and permits intelligent review by the court. FERC affirmed the ALJ by stating that the ALJ's decision on the miscellaneous cost-of-service issues was "reasonable, supported by the evidence, and consistent with Commission precedent and proper ratemaking principles."[64] FERC's affirmance of the ALJ's decision on each of these three issues is not improper.

▋ We briefly discuss each of the miscellaneous issues in turn. First, the Cities claim that FERC improperly adopted the ALJ's determination on working capital. The Cities advocated in the FERC proceedings that CIPS should receive a negative working capital allowance for its W–1 and W–2 rates. By contrast, CIPS sought a positive figure and the FERC staff proposed a zero working capital allowance. The ALJ noted that in a previous CIPS case

---

**59.** See City of Piqua, Ohio v. FERC, 610 F.2d 950 (D.C.Cir.1979).

**60.** See, e.g., Public Service Co. of New Mexico v. FERC, 628 F.2d 1267, 1270 (10th Cir.1980), cert. denied, 451 U.S. 907, 101 S.Ct. 1974, 68 L.Ed.2d 295 (1981).

**61.** See, e.g., Pennzoil Co. v. FERC, 645 F.2d 360, 389 n. 59 (5th Cir.1981), cert. denied, 454 U.S. 1142, 102 S.Ct. 1000, 71 L.Ed.2d 293

(1982); Richmond Power & Light v. FPC, 481 F.2d 490, 501 & n. 22, cert. denied, 414 U.S. 1068, 94 S.Ct. 578, 38 L.Ed.2d 473 (1973); WILLISTON ON CONTRACTS § 623 (3rd ed. 1961).

**62.** 5 U.S.C. § 557(c)(3)(A) (1982).

**63.** See Humbolt Express, Inc. v. ICC, 567 F.2d 1134, 1137 (D.C.Cir.1977).

**64.** Opinion No. 142 at 3; J.A. at 808.

FERC had authorized a zero cash working allowance, and the ALJ found that the Cities had failed to show that the previously established zero working allowance was unreasonable.[65] The ALJ reasoned that changing the working capital allowance figure would have required him to find that the existing charge was unjust, unreasonable, unduly discriminatory or preferential.[66] The ALJ held that the record was not sufficiently developed to make such a finding in order to permit the change which the Cities recommended.[67] We find nothing improper in FERC's affirmance of the ALJ's decision on this cost-of-service issue.

Second, the Cities claim that FERC erred by summarily adopting the ALJ's decision with respect to the transmission loss factor. The Cities claim that CIPS's evidence was inadequate to justify a 5% transmission loss factor. The ALJ, however, rejected the data introduced by the Cities as seriously flawed, and instead adopted CIPS's figures. The ALJ thoroughly explained his evaluation of the data in the Initial Decision.[68] FERC's summary affirmance of the ALJ's adoption of a 5% transmission loss figure is not improper.

Finally, the Cities claim that the ALJ erred in his rate-of-return determination by denying the Cities an opportunity effectively to cross-examine FERC's and CIPS's rate-of-return witnesses. This procedural error, the Cities contend, violates the Administrative Procedure Act, the due process clause of the Fifth Amendment, and FERC rules of practice.[69] The record of the hearing, however, reveals that the ALJ's limitation on the scope of cross-examination of the witnesses was proper. After the Cities had conducted some questioning of the rate-of-return staff witness concerning treatises upon which the witness had not relied in his direct testimony, the ALJ or-

dered that the cross-examination be limited to the testimony on direct. The ALJ's ruling was well within the range of acceptable practice for conducting a hearing,[70] and it was not an abuse of his authority to make this particular determination on the admissibility of testimony.[71]

### III. CONCLUSION

The orders under review are affirmed in their entirety except for FERC's decision on the Casey Group contracts' rate provision. We reverse that portion of the orders which permits the just and reasonable rates under the contracts to apply prospectively only from the date of FERC's order. Under the contracts, the W–2 rate as adjusted by FERC should take effect on the effective date of CIPS's filing. The case is remanded to FERC for further proceedings consistent with this opinion.

---

**65.** Initial Decision at 14–18; J.A. at 710–14.

**66.** *Cf. Public Service Commission v. FERC*, 642 F.2d 1335, 1345 (D.C.Cir.1980) (interpretation of the Natural Gas Act), *cert. denied*, 454 U.S. 880, 102 S.Ct. 362, 70 L.Ed.2d 189 (1981).

**67.** Initial Decision at 18; J.A. at 714.

**68.** Initial Decision at 39–41; J.A. at 735–37.

**69.** 5 U.S.C. § 556(d) (1982); 18 C.F.R. § 385.-505 (1983).

**70.** *See* McCORMICK ON THE LAW OF EVIDENCE § 21 (Cleary ed. 1972).

**71.** *See Second Taxing District of Norwalk v. FERC*, 683 F.2d 477, 485 (D.C.Cir.1982).