**MAINE PUBLIC SERVICE COMPANY, Petitioner,**

v.

**FEDERAL ENERGY REGULATORY COMMISSION, Respondent,**

**Central Maine Power Company, Intervenor.**

**No. 91–1118.**

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 24, 1992.

Decided May 22, 1992.

Rehearing and Rehearing En Banc Denied July 24, 1992.

---

James T. McManus, with whom Michael E. Small, Washington, D.C., was on the brief, for petitioner.

Edward S. Geldermann, F.E.R.C., with whom William S. Scherman, General Counsel, and Jerome M. Feit, Sol., Washington, D.C., were on the brief, for respondent.

Martin J. Robles, with whom John W. Gulliver, Portland, Me., was on the brief, for intervenor.

Before: EDWARDS, SENTELLE and RANDOLPH, Circuit Judges.

Opinion for the court filed by Circuit Judge RANDOLPH.

RANDOLPH, Circuit Judge:

This case is here on Maine Public Service Company's petition for review of the Federal Energy Regulatory Commission's acceptance for filing of an unexecuted transmission service agreement increasing the rate for Central Maine Power Company's transmission service to Maine Public from

$1.6866 per kW/year to $15.02 per kW/year.

## I

Part of the controversy stems from arrangements made in connection with the construction of William Wyman Unit No. 4, a 600 megawatt electric generating unit in Yarmouth, Maine (where Central Maine is located). Central Maine proposed the project in 1973, inviting other New England utilities to become joint owners on condition that they join the New England Power Pool ("NEPOOL").[1] By November 1974, Maine Public, a privately owned electric utility, and nine other utilities had accepted Central Maine's offer. At this time, the participants in this joint venture entered into a separate "Transmission Agreement." Under this agreement, Central Maine would charge these utilities for pool transmission facility ("PTF") deliveries of electric power, as defined in the NEPOOL Agreement, at the NEPOOL rate. Non-PTF deliveries, if any, were to be charged at "Central Maine's applicable rate from time to time in effect." Transmission Agreement § 3(c).

Wyman 4 became operational in 1978. By then, all of the owners except Maine Public had joined NEPOOL. Maine Public said it wanted to wait until October 31, 1980. The other owners agreed to the extension. Central Maine sent Maine Public a letter, stating that it would charge Maine Public for its Wyman 4 entitlements according to Rate Schedule No. 54, which meant $1.6866 per kW/year.

With its self-imposed deadline fast approaching, on October 29, 1980, Maine Public decided to put off joining NEPOOL for another two years. The other owners again acquiesced, and Central Maine continued to charge Maine Public the rate set out in the 1978 letter. In 1982, Maine Public again deferred membership. The decade of the 1980's passed without Maine Public becoming a member of NEPOOL.

Finally, in 1990, Central Maine filed an unexecuted transmission service agreement with the Commission which included a proposed increase of Maine Public's Wyman 4 entitlement rate to $15.02 per kW/year. In an accompanying letter to the Commission and in its supplemental filings, Central Maine explained that it was seeking a "compensatory" rate because it appeared that Maine Public was never going to join NEPOOL. Central Maine's proposed rate was a "rolled-in" rate, reflecting the costs to operate the entire transmission network, rather than either of the lower rates prescribed by the NEPOOL Agreement or Rate Schedule No. 54. *See Fort Pierce Utils. Auth. v. FERC,* 730 F.2d 778, 782 (D.C.Cir.1984); *Public Serv. Co. of New Hampshire,* 49 F.E.R.C. ¶ 61,030, at 61,116 (1989). The Commission ultimately approved Central Maine's proposed rate, both in an original order and on rehearing. *See Central Maine Power Co.,* 53 F.E.R.C. ¶ 61,465 (1990) (Order); *Central Maine Power Co.,* 54 F.E.R.C. ¶ 61,206 (1991) (Order on Rehearing).

## II

Maine Public throws up all sorts of arguments against the Commission's decision. Some are made for the first time in this court and, for that reason, must be rejected. Others violate the first principle of advocacy: in order to persuade a court to agree with one's argument, the argument must be made comprehensible. It comes as somewhat of a surprise that out of this confusing mass several meritorious contentions are able to emerge. The first contention we address is not, however, one of these.

■ 1. As Maine Public sees it, Central Maine's 1978 letter stating that the rate would be $1.6866 per kW/year amounted to a fixed rate contract. If this were correct, the *Mobile–Sierra* doctrine would preclude Central Maine from unilaterally filing a different rate with the Commission in the normal course. *See United Gas Pipe Line*

---

1. Members of NEPOOL coordinate planning and operations pursuant to a comprehensive agreement approved by FERC's predecessor agency. *See Municipalities of Groton v. FERC,* 587 F.2d 1296 (D.C.Cir.1978).

8

*Co. v. Mobile Gas Serv. Corp.*, 350 U.S. 332, 76 S.Ct. 373, 100 L.Ed. 373 (1956); *FPC v. Sierra Pacific Power Co.*, 350 U.S. 348, 76 S.Ct. 368, 100 L.Ed. 388 (1956). In a ruling adequately supported in fact and law, the Commission decided that the letter was not a fixed rate contract. When Maine Public signed the 1974 Transmission Agreement it knew that Central Maine would be charging it for its Wyman 4 entitlements at Central Maine's "applicable rate from time to time in effect" until Maine Public joined NEPOOL. Transmission Agreement § 3(c). When Wyman 4 came on line, Central Maine informed Maine Public of its "applicable rate," namely, Rate Schedule No. 54. The letter itself, which we set forth in full in the margin,[2] bore none of the characteristics of a fixed rate contract. It was not executed. It said nothing about duration, as one would expect in a fixed rate contract. The schedule to which the letter refers, No. 54, was itself an interim rate explicitly subject to change by Central Maine. To the Commission, it therefore appeared that this brief letter did not fix a rate for all time, subject only to revision under the "almost insurmountable" *Mobile–Sierra* standard. See Order on Rehearing, 54 F.E.R.C. at 61,613–14 (quoting *Kansas Cities v. FERC*, 723 F.2d 82, 87–88 (D.C.Cir.1983)). There is no basis for disturbing the Commission's interpretation of the letter. *Union Elec. Co. v. FERC*, 890 F.2d 1193, 1195–96 (D.C.Cir.1989); *Ohio Power Co. v. FERC*, 744 F.2d 162, 166 (D.C.Cir.1984).

■ 2. Apart from the fixed-rate question, Maine Public objects to the Commission's approval of Central Maine's use of "rolled-in" methodology to reach the new rate of $15.02 per kW/year. Rolled-in rates are based on the costs for the entire transmission network; the theory is that when the system is integrated, all of the facilities in the system contribute to each use of the system. *Fort Pierce Utils. Auth. v. FERC*, 730 F.2d 778, 782 (D.C.Cir. 1984); *Public Serv. Co. of New Hampshire*, 49 F.E.R.C. ¶ 61,030, at 61,116 (1989). Integration has been described as higher and lower voltage facilities operating in an interconnected and parallel way. This improves the reliability of the system because the parallel paths of electricity can act as backups for the primary path. *Sierra Pacific Power Co. v. FERC*, 793 F.2d 1086, 1088 (9th Cir.1986). The Commission has a longstanding policy in favor of rolled-in rates for integrated systems. *Otter Tail Power Co.*, 12 F.E.R.C. ¶ 61,169, at 61,420 (1980).

Before the Commission, Maine Public did not dispute that Central Maine's system was integrated. Order on Rehearing, 54 F.E.R.C. at 61,613. Its argument, repeated in this court, was that integrated or not, all of Central Maine's system, with its 345 kV and 115 kV facilities and subtransmission facilities, did not benefit Maine Public; thus, the utility should not have to share in the overall costs of maintaining the entire system through a rolled-in rate. Petition for Rehearing at 17–21. Maine Public does not do a very good job of explaining why it gets no benefit. As near as we can tell, the idea is that pursuant to Central Maine's 1978 letter, Maine Public receives power only over the 345 kV facilities. The Commission answered that so long as the system was integrated, Maine Public's particular circumstances were irrelevant. This much was settled with respect to path-

2.

September 27, 1978

Mr. G. Melvin Hovey
Vice President
Engineering & Operations
Maine Public Service Company
209 State Street
Presque Isle, Maine 04769
Dear Mel:

Central Maine Power Company will wheel on its 345 KV facilities your entitlement in W.F. Wyman #4 at Central Maine's FERC Rate Schedule No. 54.

This rate schedule provides for wheeling services at the rate of 3 [cents] per KW per mile per year. The mileage from Buxton switchyard to the Maine Yankee 345 KV switchyard which will be involved is 56.22 miles. Based on the annual rate per KW for your entitlement will be $1.6866.

Enclosed for your information is a copy of rate schedule No. 54. If you have any questions, please let me know.

Sincerely,
Donald F. Kelly
Assistant to the President

specific transmission in *Public Service Co. of New Hampshire*, 22 F.E.R.C. ¶ 63,083, at 65,269 (1983), and with respect to sub-transmission facilities in *Niagara Mohawk Power Corp.*, 42 F.E.R.C. ¶ 61,143, at 61,-532–33 (1988). So far as the Commission is concerned, the key is whether the system is actually integrated. If it is, some benefit is assumed, a policy we have approved. *City of Holyoke Gas & Elec. Dep't v. FERC*, 954 F.2d 740, 743 (D.C.Cir.1992); *Fort Pierce*, 730 F.2d at 782 & n. 11.

█ 3. Maine Public has several additional cost-related arguments. One is that the Commission did not adequately take into account the non-firm nature of Central Maine's service. After Maine Public raised this argument in its petition for rehearing, the Commission agreed generally that "non-firm transmission service warrants a lower rate than firm transmission service." Order on Rehearing, 54 F.E.R.C. at 61,612. Therefore, the Commission recalculated Central Maine's cost using the standard formula. It divided Central Maine's transmission costs by its system capability (the total amount of electricity the system can supply), rather than dividing by the system's load (the total the system actually supplies), as would be done for firm service. *New England Power Co.*, 49 F.E.R.C. ¶ 61,129, at 61,554–55 (1989), *reh'g denied*, 50 F.E.R.C. ¶ 61,151 (1990). The Commission estimated that Central Maine's system capability was 120 percent of its load. After performing these new calculations, the Commission decided that Central Maine's proposed rate was still cost-justified. In its petition to the Commission for rehearing, Maine Public quoted the testimony of Commission staff in another case to the effect that non-firm service should be billed at "incremental" (*i.e.*, variable, as opposed to fixed) cost. Petition for Rehearing at 14–15. The Commission declined to adopt this approach. *Cf. Town of Norwood v. FERC*, 962 F.2d 20 (D.C.Cir. 1992). The full Commission had never accepted it and the Commission here reasonably refused to do so based solely on expert testimony from a different case.

█ Still, the Commission's analysis—as its counsel conceded at oral argument—contains no explanation of how it derived the 120 percent figure. The Commission simply cited to *Public Service Co. of New Hampshire*, 50 F.E.R.C. ¶ 61,107, at 61,352 (1990), in which the 120 percent figure was also used. We are in the dark about why the Commission thought this percentage appropriate here. Central Maine, as intervenor, offers an explanation: the percentage reflects the fact that its reserve requirements are approximately 20 percent of peak demand. Brief for Intervenor at 18 n. 14. Perhaps so. But a court cannot sustain an agency's ruling on a ground not offered by the agency. *SEC v. Chenery Corp.*, 318 U.S. 80, 87, 63 S.Ct. 454, 459, 87 L.Ed. 626 (1943). This is a matter the Commission must address on remand.

█ 4. Maine Public's next cost-related point asks the question "why Central Maine should be allowed to charge the full firm forward-haul rate for the backhaul transmission provided to Maine Public"? Brief of Petitioner at 34. Commission counsel is as puzzled about this as we are. What exactly is "backhaul"? So far as we know, the Commission has never used the term in referring to the transmission of electricity. *Cf. Interstate Natural Gas Pipeline Rate Design*, 47 F.E.R.C. ¶ 61,-295, at 62,058–59 (1989). Whatever backhauls of electricity comprehend, Maine Public is sure they involve lower costs and therefore should lead to a lower rate. From the one-page discussion of the question in its Brief (at 34) and an earlier footnote (at 6 n. 2), we gather that Maine Public is actually referring to the "displacement" nature of the service. That is, the prevailing flow of electricity is southward along the transmission systems; Maine Public is north of Wyman 4, closer to the Canadian border; it therefore may be taking power from Canadian sources through displacement rather than directly from Wyman 4. (The process is described in *Richmond Power & Light Co. v. FERC*, 574 F.2d 610, 614 n. 9 (D.C.Cir.1978).) The Commission's response was—so what? The Commission could discern no "logical

connection" between the displacement nature of the service and an incremental rate. 54 F.E.R.C. at 61,612. Neither can we. The rest of the Commission's answer sufficiently puts the argument to rest: since Central Maine's system is integrated, a customer using the system such as Maine Public "can rightly be charged a rate that reflects a contribution to the cost of all facilities in the system, regardless of the particular power flows from time to time." *Id.* at 61,613.

■ 5. Maine Public has two reasons why the rate is discriminatory. *See* Federal Power Act, § 205(b), 16 U.S.C. § 824d(b). The first is that Maine Public is being treated differently from the other Wyman 4 owners who are charged an "incremental" rate, "reflecting certain regional backbone transmission costs" associated with Wyman 4. As a Wyman 4 owner, Maine Public thinks it should be charged the same "form" of rate as the others. The Commission responded that the other owners pay a lower rate because, as members of NEPOOL, their rates are set by the NEPOOL Agreement. Order on Rehearing, 54 F.E.R.C. at 61,611.

This court has determined that contractual rates promote economic stability. *Cities of Bethany v. FERC*, 727 F.2d 1131, 1139 (D.C.Cir.1984); *Town of Norwood v. FERC*, 587 F.2d 1306, 1310–11 (D.C.Cir. 1978). Therefore, the "mere fact of a rate disparity ... does not establish unlawful rate discrimination under section 205(b) of the Federal Power Act." *Cities of Bethany*, 727 F.2d at 1139. This does not mean that contractually determined rates may never be discriminatory. "Rate disparities resulting from a private arrangement are lawful only when the agreement was reached through fair conduct and good faith by the parties." *Id.* at 1139–40; *see also Town of Norwood*, 587 F.2d at 1313–14. The situation here meets that standard. The Transmission Agreement provides for differing rates between NEPOOL members and non-NEPOOL members. Maine Public has not argued that the resulting disparity stemmed from bad faith or unfair conduct. It is hardly in any posi-

tion to complain on that score; Maine Public itself signed on to the agreement and promised to join NEPOOL. Despite all the embellishments, Maine Public's argument is simply that it should be treated the same because it is in the same position as the other owners. *Cities of Bethany* holds that the existence of contractually determined rates can justify a rate disparity among similarly situated customers. Because Maine Public has not demonstrated that the disparity is due to anything other than the existence of the NEPOOL Agreement, the Commission reasonably concluded that the rate was not discriminatory. *Boroughs of Chambersburg v. FERC*, 580 F.2d 573, 577–78 (D.C.Cir.1978) (per curiam). The Commission decision here reflects its long-standing policy that rates should be rolled-in, except when the parties have come to some contrary private arrangement. *Otter Tail Power Co.*, 12 F.E.R.C. at 61,420.

Maine Public also invokes *Bangor Hydro Electric Co. v. FERC*, 925 F.2d 465 (D.C.Cir.1991) (per curiam). Petitioner there alleged that the disparity in its rate and the NEPOOL rate led to anti-competitive effects in the bulk power market. The Commission did not make the necessary factual findings, and we remanded. *Id.* at 468. Maine Public could take advantage of *Bangor Hydro* and similar decisions only by shouldering the burden of proving anti-competitive effects. *Cities of Bethany*, 727 F.2d at 1140–41. Maine Public made no effort to do so before the Commission. It remains a mystery why it thinks it should nevertheless succeed in this court.

■ 6. Maine Public's second discrimination argument is that it should be treated the same as other non-NEPOOL, non-Wyman 4 owners who receive power from Central Maine. On rehearing, Maine Public argued that Central Maine charges "joint, discounted rates for certain wheeling customers to accommodate the otherwise prohibitive cost of transmission over multiple intervening systems." Petition for Rehearing at 10. Maine Public asserted that it was in the same position as these other, non-NEPOOL customers. The Com-

mission disagreed: "New England utilities are routinely eliminating discounts from transmission rates applicable to non-NE-POOL services. The fact that certain preexisting contracts still retain such discounts does not constitute discrimination." Order on Rehearing, 54 F.E.R.C. at 61,611 (footnotes omitted). This was not reasoned decisionmaking. Central Maine is a "New England utility." But has it been eliminating discounts? If so, has the disparity in Central Maine's rates been reduced to such an extent that discrimination no longer exists? Or is the existing disparity otherwise justified? The Commission did not say. We therefore must remand. *City of Charlottesville v. FERC*, 661 F.2d 945, 950 (D.C.Cir.1981).

7. Maine Public tells us that the Commission based its findings on nonpublic studies. It said not a word about this in its petition for rehearing. We therefore will not consider the argument. 16 U.S.C. § 825*l*.

*Granted in part and denied in part.*