<head>

<title>USCA1 Opinion</title>

<style type="text/css" media="screen, projection, print">

<!--

@import url(/css/dflt_styles.css);

-->

</style>

</head>

<body>

                United States Court of Appeals
                    For the First Circuit

No. 98-1847
No. 98-1876
No. 98-2072

                TOWN OF NORWOOD, MASSACHUSETTS,

                          Petitioner,

                               v.

             FEDERAL ENERGY REGULATORY COMMISSION,

                          Respondent.
                      ____________________

No. 98-2198
No. 98-2199

           NORTHEAST CENTER FOR SOCIAL ISSUES STUDIES

                          Petitioner,

                               v.

             FEDERAL ENERGY REGULATORY COMMISSION,

                          Respondent.
                      ____________________

            ON PETITIONS FOR REVIEW OF ORDERS OF THE
                 FEDERAL REGULATORY COMMISSION
                                 

                             Before

                   Boudin, Stahl and Lipez,
                                
                       Circuit Judges.
                                
                                
                                
    Charles F. Wheatley, Jr. with whom Wheatley & Ranquist,
Kenneth M. Barna, Alan K. Posner and Rubin & Rudman were on
consolidated brief for petitioner Town of Norwood, Massachusetts.
    Richard Roos-Collins, Natural Heritage Institute, for
petitioner Northeast Center for Social Issue Studies.

    Larry D. Gasteiger with whom Douglas W. Smith, General
Counsel, Jay L. Witkin, Solicitor, and John H. Conway, Deputy
Solicitor, Federal Energy Regulatory Commission, were on
consolidated brief for respondent.
    Edward Berlin with whom Robert V. Zener, Swidler Berlin
Shereff Friedman, LLP, William J. Madden, John A. Whittaker and
Winston & Strawn were on brief for intervenor New England Power
Company.
    Zori G. Ferkin with whom Earle H. O'Donnell, Andrew B. Young,
Donald W. Stever and Dewey Ballantine LLP were on brief for
intervenor USGen New England, Inc.   

February 2, 2000

                               

 BOUDIN, Circuit Judge.  In this case, the Town of
Norwood, Massachusetts ("Norwood") and the Northeast Center for
Social Issue Studies ("Northeast Center") seek review of a series
of orders of the Federal Energy Regulatory Commission ("FERC")
directed inter alia to New England Power Company ("New England
Power"), which engages in interstate wholesale electric power
distribution in New England.  In a companion decision, Town of
Norwood v. New England Power Company, No. 99-1047, we decide today
a separate appeal by Norwood from the dismissal of an antitrust and
breach of contract suit that it brought in the district court
against New England Power and others.
  
                        I.  THE HISTORY  
 Our history of this case is drawn primarily from the
administrative record.  For many years New England Power served as
one of the major wholesalers of electric power in New England.  It
operates a high voltage transmission network, and in the past has
owned and operated a number of generating plants, including
hydroelectric, fossil, and nuclear.  New England Power is a
subsidiary of New England Electric System, which also owns four
"retail" distribution companies, including Massachusetts Electric
Company ("Mass Electric") serving Massachusetts, and Narragansett
Electric Company ("Narragansett") serving Rhode Island.
 New England Power sells wholesale power that it generates
or buys from others both to affiliates like Mass Electric and to
non-affiliated wholesale customers like Norwood, which operates its
own municipal electric system serving businesses and residents in
the Town of Norwood, Massachusetts.  In general, wholesale sales in
interstate commerce are subject to regulation by FERC under the
Federal Power Act, 16 U.S.C.  791a-828c, see 16 U.S.C.  824(a),
while retail rates (e.g., those charged by Mass Electric to its
business and residential customers) are subject to state
regulation, e.g., Mass. Gen. Laws ch. 164,  93-94E; see also
Boston Edison Co. v. City of Boston, 459 N.E.2d 1231, 1233 (Mass.
1984).
 Traditionally, at both the federal and state level,
electricity sales have been regulated on the familiar public
utility model:  the rates have been set forth in filed tariffs,
unreasonable or unduly discriminatory rates have been forbidden,
and an administrative agency has been charged with overseeing rates
and other related subjects (such as extension of lines, mergers,
and the like).  See generally Town of Concord v. Boston Edison Co.,
915 F.2d 17, 20 (1990), cert. denied, 499 U.S. 931 (1991).  In many
cases, as with New England Power, the suppliers are vertically
integrated and are engaged in electricity generation, intercity
transmission, and local distribution.  See id. at 19.
 As with other, once fully regulated industries,
legislators and regulators have over the last 25 years sought to
introduce a greater measure of competition into the electric power
industry.  In the case of electric power, this has been achieved
not by encouraging duplication of intercity transmission or local
distribution networks--as is occurring in the telephone industry--
but primarily by regulatory changes.  These include imposing
obligations on facilities' owners to carry power for other
suppliers ("wheeling"), encouraging customers to choose among
competing suppliers, and discouraging anticompetitive practices by
a variety of means, including restructuring so as to reduce the
incentives for anticompetitive behavior.  See generally Energy
Information Administration, U.S. Dep't of Energy, The Changing
Structure of the Electric Power Industry:  Selected Issues, 1998,
DOE/EIA-0562(98) (1998).  Both Massachusetts and Rhode Island have
been seeking to foster retail competition in the supply of
electricity.
 To this end, in December 1996, New England Power filed
with FERC proposed amendments to power sales agreements with Mass
Electric and Narragansett.  Prior to the filing, requirements
contracts obligated New England Power to supply its affiliates with
all of their needs for electric power; the wholesale rates were
specified in tariff schedules and termination by either side
required lengthy prior notice (e.g. seven years).  The proposed
amendments permitted the affiliates to terminate on short notice,
but subject to paying as a termination charge a portion of the
costs incurred by New England Power in preparing itself to meet
their projected longer-term requirements.
 FERC referred the new filings to an administrative law
judge, New England Power Co., 78 F.E.R.C.  61,080 (1997), under
whose auspices settlement discussions occurred.  See New England
Power Co., 80 F.E.R.C.  63,003 (1997).  In May 1997, New England
Power filed proposed settlement agreements, which again permitted
early termination for its affiliates (subject to termination
charges), and provided that after termination New England Power
would provide Mass Electric and Narragansett (at their option) with
new "wholesale standard offer rates" which are described below.  
The settlement also committed New England Power to file a plan with
FERC, by October 1, 1997, to divest itself of most of its
generation business.  Both of these steps, more fully described
below, were purportedly designed to foster competition.
 On October 1, 1997, New England Power sought approval
from FERC to sell practically all of its non-nuclear electrical
generating plants to USGen New England, Inc. ("USGenNE"), a
subsidiary of a major west coast public utility holding company
("PG&E").  The sale required FERC approval both for the sale of
certain facilities and the transfer of hydroelectric licenses.  16
U.S.C.  801, 824b.  In connection with its proposed purchase of
assets, USGenNE agreed to assume responsibility for providing
wholesale standard offer service to Mass Electric and Narragansett,
and New England Power proposed to implement a rate freeze that
would prevent increases in rates for its remaining wholesale
customers, including Norwood.
 Since 1983, Norwood has purchased electricity at
wholesale from New England Power and resold it to local businesses
and residential customers.  Its agreement with New England Power,
as extended by Norwood, obligated Norwood to take its requirements
from New England Power through October 31, 2008.  Regarding the
wholesale standard offer rates proposed for New England Power
affiliates as an unfair advantage to retail "competitors," Norwood
notified New England Power on March 4, 1998, that it was switching
to a different wholesale supplier.  Norwood has now become a
wholesale customer of Northeast Utilities, another major supplier
of wholesale electricity in New England.
 New England Power countered on March 18, 1998, by filing
a proposed tariff revision that would permit its remaining
wholesale customers to terminate their long-term requirements
contracts on 30 days' notice.  But the tariff purported to subject
such customers to payment of a contract termination charge to
permit New England Power to recover the revenues that it would have
collected had the customers continued to pay the fixed tariff rate
through the contract term, less the expected costs avoided by not
providing service.  New England Power subsequently billed Norwood
for a portion of this termination charge but Norwood apparently has
declined to pay.  
 In the proceedings before FERC, Norwood objected to each
of the three measures proposed by New England Power: (1) its
proposed settlement with its affiliates to terminate their
requirements contracts and to provide them the option of wholesale
standard offer rate service; (2) its proposed divestiture of
generating facilities to USGenNE and the associated freeze on the
wholesale rates New England Power charged to its unaffiliated
wholesale customers; and (3) its March 1998 tariff amendments
allowing unaffiliated wholesale customers like Norwood to terminate
their requirements contracts on short notice but only on payment of
a contract termination charge.
 In a set of orders in these three proceedings issued
between November 1997 and June 1998, FERC rejected virtually all of
Norwood's requests for relief.  Among other things, FERC approved
the settlement agreement; it approved the sale of non-nuclear
generating facilities to USGenNE and the transfer of hydroelectric
licenses to it; and it upheld New England Power's imposition of a
contract termination charge on unaffiliated purchasers who sought
to terminate their existing contracts prematurely.  Norwood sought
direct review in this court, 16 U.S.C.  825l(b), and we have
consolidated its appeals into the present case.
 Separate petitions for review of the FERC orders were
filed in this court by Northeast Center.  Its petitions challenged
the orders insofar as they approved the sale to USGenNE of New
England Power's hydroelectric generating facilities and associated
licenses.  Northeast Center challenged these actions on the ground
that FERC had violated the Federal Power Act by failing to consider
whether the divestiture would reduce property tax revenues of
adjacent communities, and that FERC had violated both that statute
and environmental laws by failing to give adequate attention to the
potential environmental impact of the transfers.  This court
consolidated these petitions for review with those of Norwood.     
    
                         II. DISCUSSION
 1.  Norwood's main attack, but not its only one, is upon
FERC's approval of the contract termination charge that the New
England Power tariff amendment of March 18, 1998, imposes on
unaffiliated wholesale customers; this charge, as already
explained, applies to a requirements contract customer who chooses
to end its purchases before the end of the contract term and
without the required notice.  The amendment provides the customer
an option to terminate at short notice but sets a specific tariff-
based price on early departure.
 FERC is entitled to review tariff amendments governing
wholesale power sales under a "just and reasonable" standard, 16
U.S.C.  824d(a); and at least on the surface the amendment serves
the Commission's goal of fostering competition by giving Norwood an
option to enter immediately into competitive purchasing.  But
Norwood argues that FERC's action is unlawful for a number of
independent reasons, which we next address.
 First, Norwood says that the approval is inconsistent
with the Commission's "stranded cost recovery" provisions adopted
in FERC Order No. 888 and associated regulations.  Order No. 888
imposed on investor-owned power companies a general obligation to
wheel power for customers, many of whom had previously bought their
power from one transmission company--normally, an integrated
supplier--but now wished to use that company merely to transport
power bought from another company.  The order conditioned this
wheeling obligation on the customers contributing to the recovery
of the so-called "stranded costs" of the transporting company.
 Stranded costs were defined in detail by FERC formulas
but the general concept was this:  in providing "bundled" service
(generation and transmission), power companies had made investments
expecting to recover them from captive customers.  The wheeling
obligation imposed by Order No. 888 could permit such customers to
reach cheaper power elsewhere; and in some cases this would leave
the power companies with investments, especially in generation
facilities, that could not be fully recovered in a competitive
environment.  Stranded cost recovery to protect reasonable
expectations was FERC's quid pro quo for open access to competing
electricity suppliers during this period of transition.
 The stranded cost recovery for which the orders and
regulations provided was framed as an obligation of those customers
who had previously been power customers of the integrated supplier
but now chose to use only its transmission system.  See 18 C.F.R.
35.26(b)(1), (c)(2) (1999).  Norwood's first objection to the
contract termination charge in this case is that although Norwood
previously bought power from New England Power, it got its
transmission service for such power from Boston Edison and does not
intend to use New England Power transmission service in the future.  
Thus, says Norwood, it falls outside the scope of FERC's stranded
cost regulation and the tariff is inconsistent with Order No. 888.
 FERC concedes that its Order No. 888 regulations do not
apply in this case.  But, as FERC notes, there is a separate
(although parallel) justification for stranded cost recovery in the
present case:  Norwood as a requirements-contract customer of power
furnished by New England Power is being afforded an option to
switch immediately to a competing supplier, without the seven
years' notice required by the contract.  New England Power Co., 83
F.E.R.C.  61,174, at 61,722-23 (1998).  In short, there is a
different reason for similar relief; and while Order No. 888 does
not mandate the new tariff, neither does it forbid it.  See Order
No. 888, 61 Fed. Reg. at 21662 (reserving the possibility of
stranded cost recovery in other situations).
 Norwood also argues that Order No. 888 and FERC's
regulations excluded from stranded cost recovery those cases where
a requirements contract was entered into or extended after July 11,
1994.  FERC's stated reason for this limitation was that on that
date it first gave public notice of its stranded cost proposal;
thereafter, for new contracts the supplier and purchaser could make
their own arrangements for early termination, recovery, and the
like.  Order No. 888, 61 Fed. Reg. at 21641; see also 18 C.F.R.  
35.26(b)(7), (c)(1)(ii).  Norwood says that while its original
contract was made prior to July 11, 1994, New England Power and
Norwood agreed to changes in the agreement after that date.  But
the restrictions in Order No. 888 are no more than conditions on
stranded cost recovery under that order and do not preclude the
Commission from allowing tariffs that permit somewhat similar
recovery whenever a customer purports to disregard an existing
contractual obligation.
 Second, Norwood claims that the tariffed termination
charge is nothing more than an effort to collect contract damages
for early termination through the Commission's processes, and that
this conflicts with FERC's practice of deferring to the courts on
matters of contract and deprives Norwood of the chance to counter
a contract breach claim by showing that New England Power breached
the contract first.  Admittedly, the stranded cost recovery in the
tariff is closely akin to contract damages, and the Commission in
the past has declined to adjudicate some contract disputes.  E.g.,
Southern Cal. Edison Co., 85 F.E.R.C.  61,023 (1998).
 But FERC's abstention in cases like Southern California
Edison appears primarily to reflect an unwillingness to resolve
disputes about the meaning of disputed contract provisions.  Here,
the Commission has not interpreted Norwood's contract with New
England Power or determined whether Norwood has breached the
contract or has been freed from the contract based on a breach by
New England Power.  See New England Power Co., 84 F.E.R.C.  
61,175, at 61,920 (1998).  It has merely upheld, on a generic
basis, a termination charge for those customers who are bound by
existing contracts but wish to avoid their obligations.
 Third, Norwood claims that FERC had to reject the New
England Power tariff offering customers the termination option
because it conflicts with the Mobile-Sierra doctrine and the filed
rate doctrine.  The former, developed in cases interpreting the
Federal Power Act and the Natural Gas Act, Federal Power Comm'n v.
Sierra Pac. Power Co., 350 U.S. 348, 354-55 (1956); United Gas Pipe
Line Co. v. Mobile Gas Serv. Corp., 350 U.S. 332, 344 (1956),
prevents FERC from overriding a contract unless it finds that the
contract is contrary to the public interest.  See Texaco, Inc. v.
FERC, 148 F.3d 1091, 1095-97 (D.C. Cir. 1998).  The doctrine
protects a party's interest in its contract (unless overridden by
a public interest finding).
 In a sense, the addition of the express option to
terminate earlier (at a specified price) can be viewed as modifying
the contract.  But from Norwood's vantage, the option merely gives
it something that it did not have before; it remained free to
insist that New England Power continue to supply power under the
contract until expiration.  The termination charge is certainly a
detriment but, absent a showing that its formula is any worse than
contract damages, it merely spells out what would have been the
law's remedy if Norwood had no option but simply breached the
existing contract.
 The filed rate doctrine can--so far as relevant here--be
regarded as a prohibition on retroactive increases for tariffed
services.  See Arkansas La. Gas Co. v. Hall, 453 U.S. 571, 577-78
(1981).  Formally, the filed rate doctrine says that the only
lawful rate is that reflected in the tariff on file when the
service is performed, id., but the refusal to permit retroactive
increases is taken as a corollary, id. at 578.  Most regulatory
statutes, but not all, see Federal Power Comm'n v. Sunray DX Oil
Co., 391 U.S. 9, 24 (1968), permit reparations to the customer if
the tariff rate is later shown to be unreasonably high, but the
carrier can never collect more than the tariffed rate.
 Norwood is not being asked to pay more for past purchases
than provided for by the tariff in effect at the time of such
purchases.  The tariff change, as just noted, gives Norwood an
option it did not have before to cancel future purchases on short
notice by paying a termination charge--hardly a retroactive
increase in charges for past purchases.  Norwood says that the
change is retroactive because it was imposed after Norwood had
ceased to make purchases under FERC Tariff No. 1, Norwood having
disclaimed its existing contract and signed on with a new supplier.  
But the change only governed Norwood as to its future purchases--or
failures to purchase--from New England Power; there was no effort
to increase rates for purchases made in the past, which is the
pertinent concern of the filed rate doctrine.
 Fourth, Norwood says that New England Power has failed to
supply data to show that it is "just and reasonable" to require
Norwood to pay a contract termination charge allegedly amounting to
$78 million for the period from 1998 through 2008.  Norwood derives
this figure by projecting the termination charges from April 1,
1998, through the expiration of the extended contract which Norwood
has now disavowed.  The Federal Power Act requires just and
reasonable rates, 16 U.S.C.  824d(a), and the regulations for rate
filings generally require the filing of cost of service data for
new or increased rates, 18 C.F.R.  35.12, 35.13.
 But the termination charge is not a new or increased rate
for supplying energy.  It is a formula-driven charge to cover
certain projected losses to New England Power caused by not
supplying electricity after preparing to do so, calculated based on
rates already approved by FERC.  Thus the contract termination
charge in no way represents a rate increase for Norwood.  If these
charges were miscomputed or unsupported, Norwood might well have a
legitimate objection; but it has not explained any such objection
to us, let alone tried to support it with citations or figures.
 Before FERC, Norwood primarily urged that the contract
termination charge filing be rejected in its entirety.  But in a
footnote in its motion to intervene, and more fully in its motion
for rehearing, Norwood also sought a hearing regarding the
reasonableness of the amount that New England Power sought to
recover--referring, inter alia, to alleged problems with the
contract termination charge calculation.  FERC denied the request
for rehearing, concluding that no evidentiary hearing was necessary
because no party had raised a disputed issue of material fact.  New
England Power Co., 84 F.E.R.C.  61,175, at 61,920 (1998).
 To whatever extent there was in fact a disputed issue
regarding the termination charge calculation that necessitated a
hearing, cf. Louisiana Energy & Power Auth. v. FERC, 141 F.3d 364,
371 (D.C. Cir. 1998), Norwood does not identify it to us.  FERC
suggested in its initial order that Norwood could file a section
206 complaint, 16 U.S.C.  824e, challenging the substance of the
contract termination charge, New England Power Co., 83 F.E.R.C.  
61,174, at 61,724 (1998), and presumably it can still do so, cf.
Oxy USA, Inc. v. FERC, 64 F.3d 679, 690 (D.C. Cir. 1995).
 Fifth, Norwood's final set of objections to the
termination charge are of a different character.  In substance,
Norwood complains that the termination charge imposed on it exceeds
the charge imposed on affiliates of New England Power; that the so-
called wholesale standard offer rate (available to the affiliates
but not to Norwood) is unfairly low during the opening years and
dangerously high thereafter; and that these discrepancies, and the
threatened effects, require rejection of both the termination
charge and the standard offer rates--or at least evidentiary
hearings.
 The Commission's answer regarding the contract
termination charge--that the affiliates "settled" with New England
Power, New England Power Co., 83 F.E.R.C.  61,174, at 61,723  n.13
(1998), reh'g denied, 84 F.E.R.C.  61,175, at 61,920 (1998)--would
make the hairs stand up on the neck of an old-fashioned utility
lawyer.  The utility tradition, growing out of hostility to
preferences and rebates, has been to oppose unequal treatment or at
least to treat it with great skepticism.  Specifically, the Federal
Power Act outlaws unjustifiably disparate treatment of similarly
situated entities under the rubric of "undue preference."  16
U.S.C.  824d(b).
 But differential treatment does not necessarily amount to
undue preference where the difference in treatment can be explained
by some factor deemed acceptable by the regulators (and the
courts).  E.g., Cities of Newark v. FERC, 763 F.2d 533, 546 (3d
Cir. 1985).  The District of Columbia Circuit, which reviews more
such regulatory matters than any other court, has approved
divergent treatment that stems from a settlement, reasoning that
there is a public interest in settlements and that one party should
not be able to frustrate a settlement for everyone else.  Cities of
Bethany v. FERC, 727 F.2d 1131, 1138-40 (D.C. Cir.), cert. denied,
469 U.S. 917 (1984); United Mun. Distribs. Group v. FERC, 732 F.2d
202, 212-13 (D.C. Cir. 1984).
 Norwood attacks this justification for differential
treatment on the ground that it should not apply where the non-
settling parties were denied an opportunity to attack the
settlement in the administrative proceeding.  However, even
assuming that such a limitation exists (and perhaps it should), the
Administrative Law Judge found that Norwood's request for a hearing
on the settlement was out of time and unsupported, New England
Power Co., 80 F.E.R.C.  63,003, at 65,040-41 (1997), and Norwood
offers no answer to this ruling.
 Under these circumstances, we think that the mere
disparity in Norwood's contract termination charge vis  vis that
of other companies that settled is not a per se violation of the
"undue preference" prohibition.  Norwood passed up the opportunity
to settle with New England Power regarding termination, see New
England Power Co., 83 F.E.R.C. 61,174, at 61,723 n.13 (1998), and
argued to FERC that the contract termination charge approved in the
settlement proceeding was too high.  It seems to us that at least
where a party has been offered the same settlement and refused it,
a claim based simply on an abstract right to be treated the same as
settling companies has much less force--and to recognize it would
subvert the public interest in promoting settlements.   Whether an
undue preference claim might be made based on competitive or other
market impacts is a different issue, addressed below.
 2.  Norwood's more interesting claim of undue preference
is directed not to the contract termination option and charge--
Norwood's main target--but to the wholesale standard offer rates,
which appears to have been offered only to affiliates of New
England Power.  These rates were not offered to Norwood; and
although they were initially included in the FERC settlement, they
do not appear to be a resolution of any existing legal obligation
between New England Power and its affiliates.  Their origin and
justification are quite different.
 The wholesale standard offer rates, it appears, are a
schedule of wholesale power rates that begins at a rather low level
and then climbs over a number of years to a rather high level.  It
interlocks with schedules of retail standard offer rates that New
England Power's affiliates have agreed, in settlements with their
respective state commissions, to offer as a safeguard for retail
customers who do not or cannot immediately take advantage of the
competitive sources of retail supply that both federal and state
regulators foresee developing.  See New England Power Co., 82
F.E.R.C.  61,179, at 61,664 (1998); In re Massachusetts Elec. Co.,
Mass. D.P.U. 96-25, at 23-25 (Feb. 26, 1997).  To the extent that
customers take advantage of these initially favorable retail rates
from the affiliates, the retailers themselves will have counterpart
wholesale rates.
 These "backup" standard offer rates are not intended as
a permanent low-cost option.  On the contrary, they increase
sharply over a brief period partly in order to encourage customers
to migrate into the competitive market once they have had time to
negotiate with retailers who, because of wheeling obligations
imposed at both the wholesale and retail level, will then be able
to compete to supply once-captive customers.  See In re
Massachusetts Elec. Co., Mass. D.P.U., at 23-25.  But Norwood,
being a municipal system, is not subject to these wheeling
obligations and has no obligation to offer retail standard offer
rates as a backup for its retail customers.  See Mass. Gen. Laws
ch. 164,  47A.
 Norwood says that the wholesale standard offer rates were
denied to it and are below the market rate; it argues that FERC
therefore should have held hearings to determine whether the rates
were unduly discriminatory.  FERC explained the special rates by
pointing to the New England Power affiliates' obligation to offer
retail standard offer rates to their own customers and their
consequent need for dovetailed wholesale standard offer rates from
their supplier.  New England Power Co., 82 F.E.R.C.  61,179, at
61,664.  Norwood was not similarly situated because it had no
similar obligation.  On the surface, this is a plausible
explanation for differential treatment, at least in the absence of
some plausible rejoinder from Norwood.
 Norwood also complains that the wholesale standard offer
rates were not justified by cost-of-service data.  New England
Power did not submit any because it contended that the initial
standard offer rates did not amount to a rate increase and cost-of-
service data was therefore not required by FERC regulations.  18
C.F.R.  35.13(a)(iii).  When USGenNE proposed to take over the
standard offer service from New England Power, it did so as part of
its application for "market-based rate" approval:  FERC approved
the petition in relevant part, concluding that USGenNE need not be
limited to cost-of-service rates because it did not have market
power in generation or transmission.  New England Power Co., 82
F.E.R.C.  61,179, at 61,662, 61,665.  See generally Louisiana
Energy & Power Auth. v. FERC, 141 F.3d 364, 365 (D.C. Cir. 1998).  
Norwood offers no response to these arguments.
 3.  This brings us to Norwood's final set of arguments,
alleging that the FERC actions it attacks will have a series of
anticompetitive effects.  One action is the relatively high
contract termination charge imposed on Norwood; the second is the
provision to Mass Electric of the favorable wholesale standard
offer rates.  Taken together, says Norwood, these steps will have
a variety of anticompetitive consequences and, at the very least,
FERC should have conducted an evidentiary inquiry into this claim.
 Conceivably, a difference in treatment otherwise
justified might be less so if it had an anticompetitive impact, see
Cities of Bethany v. FERC, 727 F.2d 1131, 1141 (D.C. Cir.), cert.
denied, 469 U.S. 917 (1984), and the agency might be faulted if it
declined even to inquire into a well-supported claim of this kind,
cf. Michigan Pub. Power Agency v. FERC, 963 F.2d 1574, 1578-79
(D.C. Cir. 1992).  In the agency and in this court, Norwood has
alleged anticompetitive effects.  But mere allegations of impact do
not trigger an evidentiary hearing.  To justify a hearing, the
allegations must raise a genuine issue of material fact that cannot
be adequately resolved on the written record.  Louisiana Energy &
Power Auth. v. FERC, 141 F.3d 364, 371 (D.C. Cir. 1998).
 Here, Norwood appears to allege three different effects:  
that the initial wholesale standard offer rates are so low that
they will discourage the development of wholesale competition in
New England that might otherwise provide lower prices for Norwood,
enabling it better to serve its customers and to compete with New
England Power affiliates; that the denial of standard offer rates
to Norwood in these early years, coupled with a high contract
termination charge, will force Norwood's costs to a level well
above those of New England Power's affiliates, again impairing
Norwood's ability to compete with those affiliates; and that higher
standard offer rates in later years will force up the general level
of wholesale prices in New England, harming consumers and Norwood
at the same time.
 These assertions appear, with more or less detail, in  
the affidavits of two experts that Norwood submitted to FERC.  They
were countered in some measure by other expert testimony.  While
some of the assertions in Norwood's affidavits are doubtful at
best, the Commission's orders offer only a relatively sketchy
discussion of competitive impact.  In sum, if Norwood had seriously
briefed the issue, we might have a serious issue to decide.
 Instead, Norwood's main brief offers us only a couple of
conclusory statements coupled with references to its affidavits.  
Norwood makes little effort to explain the basis for its
predictions, does not match them up with what the Commission said
in its orders, and does not address obvious critical issues:  e.g.,
the actual extent of competition between Norwood and New England
Power's affiliates, each of whom primarily serves separate retail
areas; why new wholesale competition will not develop as the
wholesale standard offer rates rise; and why imports of electricity
will not constrain USGenNE.
 Since Norwood has virtually abdicated its responsibility
to brief the issue to us, FERC's own brief only touches on the
competition issues; the New England Power brief, although more
helpful, offers only brief comments on a few points.  Thus, we have
no coherent and developed argument in this court to address on the
competition issue.  In these circumstances, Norwood has forfeited
its argument; developing a sustained argument out of economic
materials and legal precedents is the job of the appellant, not the
reviewing court, as we have previously warned.  U.S. Healthcare,
Inc. v. Healthsource, Inc., 986 F.2d 589, 595-97 (1st Cir. 1993);
see also Gamma Audio & Video, Inc. v. Ean-Chea, 11 F.3d 1106, 1113
(1st Cir. 1993).
 Indeed, in an area this complicated, it is doubtful that
we could do an adequate job on our own, although we might still try
if a severe threat to the public interest appeared likely from the
affidavits.  But a negative long-term effect on power rates in New
England is among the less plausible of the conjectures; and the
short-term competitive impact on Norwood is something that it
should have been able to explain and support in an appellate brief
(if the materials were in the record) and it has not done so.  
Payment of a large termination charge, due in some measure to
Norwood's own maneuvers, is not the same thing as demonstrated harm
to competition.
 4.  Northeast Center describes itself as a non-profit
corporation dedicated to "public education regarding environmental
changes related to technology and energy uses."  While Norwood is
primarily concerned with rates and termination charges, Northeast
Center's focus is on the transfer of generating facilities from New
England Power to USGenNE and the related transfer of hydroelectric
licenses.  
 Both of these steps required the Commission's approval
under a broad "public interest" standard.  16 U.S.C.  801,
824b(a); 18 C.F.R.  9.3.  Northeast Center intervened in the
administrative proceedings and asked the Commission to hold
evidentiary hearings on two alleged possible effects of the
transfers:  harm to the environment and reduced property tax
revenues for towns that collected property taxes on the facilities.  
The Commission declined to do so or to prepare an environmental
impact statement or assessment.  New England Power Co., 82 F.E.R.C.
62,138, at 64,214-15 (1998), reh'g denied, 83 F.E.R.C.  61,272,
at 62,132-34 (1998); New England Power Co., 82 F.E.R.C.  61,179,
at 61,661 (1998), reh'g denied, 83 F.E.R.C.  61,275, at 62,148-49
(1998).
 In this court, Northeast Center says that these failures
were error.  FERC counters that Northeast Center lacks Article III
standing to pursue these issues in court.  Article III standing is
a threshold issue, Steel Co. v. Citizens for a Better Environment,
523 U.S. 83, 88-102 (1998).  The burden to show standing is upon
the litigant whose standing is challenged, Benjamin v. Aroostook
Med. Ctr., Inc., 57 F.3d 101, 104 (1st Cir. 1995), and is not
established merely because the agency permitted intervention, City
of Orrville v. FERC, 147 F.3d 979, 985 (D.C. Cir. 1998).
 The pertinent ground rules for association standing are
clear enough in the abstract:  to pursue judicial review, an
association or similar representative organization may have
standing if at least one of its members has standing in his or her
own right, the interests served by the suit are pertinent to the
mission of the organization, and relief does not require the
presence of the members in the suit.  United States v. AVX Corp.,
962 F.2d 108, 116 (1st Cir. 1992).  An individual has standing if
he can show that he is suffering or is threatened with injury in
fact to a cognizable interest; that the injury is causally
connected to the conduct complained of; and that the court is
competent to afford relief that will or is likely to redress the
injury.  Bennett v. Spear, 520 U.S. 154, 162 (1997).   
 We start with the claim of environmental injury.  
Northeast Center says that it is concerned with the environment,
and its member directors live in Vermont and New Hampshire and use
the Connecticut River and its tributaries for recreation.  The
hydroelectric facilities being transferred are located in these
states on the Connecticut River.  And, it is alleged, the transfer
from one licensee and owner (New England Power) to the other
(USGenNE) could affect the management of the dams, primarily with
regard to water releases and timing, in ways that affect
recreational uses, erosion, flooding and water quality.
 Thus, the issue of standing and "the merits"
substantially overlap.  FERC's public interest standard encompasses
environmental concerns, see Wisconsin v. FERC, 104 F.3d 462, 470
(D.C. Cir. 1997), and arguably a substantial threat from the
transfer would require attention, cf. Platte River Whooping Crane
Critical Habitat Maintenance Trust v. FERC, 876 F.2d 109 (D.C. Cir.
1989); Southern Cal. Edison Co., 49 F.E.R.C.  61,091 (1989).  But
if there is no credible threat, then the Northeast Center and its
members lack standing, Adams v. Watson, 10 F.3d 915, 922-23 (1st
Cir. 1993), and, even if they had standing, FERC's refusal to
pursue a speculative claim would not be error.  Northeast Utils.
Serv. Co. v. FERC, 993 F.2d 937, 958-59 (1st Cir. 1993).
 From either standpoint, the present case is not a close
one.  FERC was understandably skeptical of the environmental claim;
building and operating a major new dam is likely to have
environmental consequences, but the transfer of existing facilities
from one large utility to another is simply a change in ownership,
and USGenNE became subject to the same license conditions and
regulations that had bound New England Power.  If there is anything
in the history of USGenNE or its west coast parent that suggests
that either would mismanage the facilities or disobey the
conditions or regulations, Northeast Center has not mentioned it.  
 About all that Northeast Center has done is to refer in
passing to a report by a joint state commission, which states that
New England Power has done a superior job in managing river flows.  
But there is nothing to show or even suggest that USGenNE is likely
to do a worse job in operating the same facilities or that any
predictable variations in its performance are likely to have a
significant effect on the environment.  And this report, which is
not directed specifically at USGenNE and, moreover, which Northeast
Center hardly refers to in its briefs, is all that Northeast Center
offers to support its claim of standing or its demand for a full-
scale evidentiary investigation by FERC.
 Even the more generous of the cases that uphold standing
or require an environmental impact statement or assessment under
the National Environmental Policy Act ("NEPA") involved projects
more likely to threaten harm or a more particularized showing that
harm is threatened.  Cf. United States v. Students Challenging
Regulatory Agency Procedures (SCRAP), 412 U.S. 669, 683-90 (1973).  
FERC's own regulations, made in conformity with the governing
regulations under NEPA, categorically classify such transfers of
ownership and licensing as the kind of projects not likely to have
a significant environmental impact or to require a NEPA
environmental impact statement or smaller scale assessment.  18
C.F.R.  380.4(a)(8), (16).  If there was reason here for a
different outcome, Northeast Center has not provided it.
 A FERC action that otherwise falls within a categorical
exclusion to the NEPA requirements may nonetheless warrant an
environmental assessment or environmental impact statement if the
action may affect, inter alia, wetlands, anadromous fish species,
or a National Refuge, 18 C.F.R.  380.4(b), all of which Northeast
Center says are affected by the projects at issue.  But the
regulation only requires an assessment or impact statement if
"circumstances indicate that an action may be a major Federal
action significantly affecting the quality of the human
environment."  Id.  As discussed above, Northeast Center has not
presented any evidence indicating how the license and asset
transfers (as opposed to the projects themselves) will have any
impact on the environment.
 Turning to economic impact, the nature of Northeast
Center's claim is quite different.  It asserts that competition in
the supply of electric power is likely in some cases to impair the
value of the existing utility plant, and it points to a Moody's
investment survey to support that view.  The actions taken in this
case by the Commission are designed to foster competition.  Ergo,
says Northeast Center, the value of the transferred generating
facilities may be reduced and the property taxes paid to local
communities may decline.  This, it says, should have been
investigated.
 It is sufficient to dispose of this case that Northeast
Center has not shown that its own interests would be affected by
such a decline in property taxes; and, even assuming that its
members or directors might be so affected (based on residence),
Northeast Center has not shown that its representational function
extends to such private economic concerns.  Germaneness of the
interests served by a lawsuit to the purpose of the organization  
is a settled requirement for standing based on membership, Hunt v.
Washington State Apple Advertising Comm'n, 432 U.S. 333, 343
(1977), "preventing litigious organizations from forcing the
federal courts to resolve numerous issues as to which the
organizations themselves enjoy little expertise and about which few
of their members demonstrably care."  Humane Soc'y of the United
States v. Hodel, 840 F.2d 45, 57 (D.C. Cir. 1988); see also UAW v.
Brock, 477 U.S. 274 (1986).
 Accordingly, we need not reach the question whether a
showing of likely economic impact, made by a person with standing,
would compel FERC to pursue the matter, but we are entitled to
express our doubts.  It is true that the public interest concept is
a broad one, but there are limits.  Here, FERC has approved a set
of transactions based on their effects in the electric power
industry, its main responsibility and concern.  It is far from
clear that a policy aimed at securing lower-cost power for
consumers through more competition would or should be curtailed
even if it were shown to have some effect on plant value and local
taxes in a few communities.  Cf. Northeast Utils. Serv. Co. v.
FERC, 993 F.2d 937, 951 (1st Cir. 1993).
 It is worth adding that, to the extent such effects may
be predicted from competition, the effects are primarily due to
actions already taken by FERC in broader proceedings such as the
one that led to Order No. 888.  And while competition may well
reduce the economic value of some existing plants, this case may be
an exception:  ironically, Northeast Center's exhibit suggests that
the transferred facilities sold for more than their book value.
 The petitions for review are denied.

</body>

</html>